**Olimpia LAZO–MAJANO, Petitioner,**

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

No. 85–7384.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 9, 1986.

Decided April 2, 1987.

revealed this information during voir dire, was replaced by one of the alternate jurors.

R. Lee Hagelshaw, San Francisco, Cal., for petitioner.

591 F.2d at 516 nn. 1 and 2.

Eileen A. Carty, Richard M. Evans, Elouise Rosas, Washington, D.C., for respondent.

Before PREGERSON, POOLE and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

Olimpia Lazo-Majano appeals from orders denying her asylum under 8 U.S.C. § 1158(a) and withholding of deportation under 8 U.S.C. § 1253(h). We reverse the Board of Immigration Appeals and remand for proceedings not inconsistent with this decision.

*Events.* Olimpia Lazo-Majano is a thirty-four year old woman. She is the mother of three children. In 1981, when she was twenty-nine, her husband left El Salvador for political reasons: he had been in the rightist paramilitary group known as OR-DEN; when he quit he was wanted by the guerrillas and distrusted by the government. Olimpia had always lived in the same small town. For five years she had been working as a domestic for another woman, getting a day off every fifteen days. In the middle of April 1982, she received a telephone call from Sergeant Rene Zuniga who had known her since childhood. He asked her to wash his clothes. Olimpia agreed.

On her day off during the next six weeks Olimpia worked for Zuniga at Zuniga's place. Zuniga then pointed out that Olimpia's husband was no longer in El Salvador and raped her. In Olimpia's words: "With a gun in his hand he made me be his."

In the following months Olimpia accepted Zuniga's domination. She continued to wash for him on her days off. She accepted taunts, threats, and beatings from him. He broke her identity card in pieces and forced her to eat the pieces. He dragged her by the hair about a public restaurant. He pummeled her face, causing a blood clot to form in one eye; she thought that she had lost the eye. Olimpia became nervous, preoccupied, and depressed, ate little, and became thin and frail. She wanted to escape her tormentor but saw no way of doing so.

Central to the situation was the fact that Zuniga was a sergeant in the *Fuerza Armada,* the Armed Force which is the Salvadoran military. Zuniga used his gun in forcing Olimpia to submit the first time. On another occasion Zuniga held two hand grenades against her forehead. On another occasion he threatened to bomb her. When he referred to her husband, Zuniga said that if he returned Zuniga himself would cut him apart, kill both Olimpia and her husband and say that they were both subversives. Zuniga told Olimpia that it was his job to kill subversives.

Zuniga said to Olimpia that if she ever told on him he would have her tongue cut off, her nails removed one by one, her eyes pulled out, and she would then be killed. As Olimpia recalls his statement, he said: "And I can just say that you are contrary to us; subversive." When he was angry with her in the restaurant, he told a friend from the police "in front of all the other people in the restaurant" that she was a subversive and that was why her husband had left: "because she was a subversive."

Olimpia believed the Armed Force would let Zuniga carry out his threat. She believed that in 1979 a nineteen-year old boy she knew by sight had been tied, tortured and killed by the Armed Force; that in 1981 the husband of a neighbor had been taken away in a truck at night with fifteen others and killed by the Armed Force; that the Armed Force had raped "young college girls," as had Zuniga himself. In her view there was nobody in El Salvador that could stop the Armed Force from doing such things. In her experience when Zuniga was dragging her by the hair in the restaurant no one helped because where the Armed Force is concerned, "no one will get involved."

In 1982 Olimpia escaped from Zuniga, left El Salvador and illegally entered the United States. In January 1983, Olimpia was ordered to show cause why she should not be deported for entry without inspection. *See* 8 U.S.C. § 1251(a)(2). She admit-

ted deportability and applied for political asylum, claiming fear of persecution by Zuniga. Her request was denied by Immigration Judge William F. Nail on March 23, 1984. On May 9, 1985, The Board of Immigration Appeals upheld Judge Nail's decision and dismissed her appeal. It found that "the evidence attests to mistreatment of an individual, not persecution" and cited *In re Pierre*, 15 I & N Dec. 461 (BIA 1976) (a wife threatened with death by her husband, a high Haitian official, did not show persecution for a political opinion even though the government of Haiti would not restrain her husband). The Board declared as to the plight of Olimpia that it was "not unsympathetic with this deplorable situation" but "the fact remains that such strictly personal actions do not constitute persecution within the meaning of the Act."

*Statutory Framework.* Two statutory schemes are available to an alien who resists deportation:

■ Section 243(h) of the Immigration and Nationality Act prohibits deportation of an alien whose "life or freedom would be threatened ... on account of ... political opinion." 8 U.S.C. 1253(h). To satisfy section 1253(h), an alien must show a "clear probability" of persecution—that is, that it is "more likely than not" that he or she will be persecuted. *INS v. Stevic*, 467 U.S. 407, 424, 104 S.Ct. 2489, 2498, 81 L.Ed.2d 321 (1984); *Vides-Vides v. INS*, 783 F.2d 1463, 1466 (9th Cir.1984). This court reviews a denial of an application for withholding of deportation under the standard that the denial is to be upheld if supported by substantial evidence. *Vides-Vides*, 783 F.2d at 1466.

■ Section 208(a) of the Refugee Act of 1980 gives the Attorney General discretion to grant asylum to refugees. 8 U.S.C. § 1158(a). A "refugee" is an alien who is unwilling or unable to return to his or her former country "because of persecution or a well-founded fear of persecution on account of ... political opinion." 8 U.S.C. § 1101(a)(42)(A). The "well-founded" fear standard is more generous than the "clear probability" standard for withholding of deportation, and the Board has an obli-

gation to apply the standard set by the statute. *Bolanos-Hernandez v. INS*, 749 F.2d 1316, 1326 (9th Cir.1985). The Board in this case has not distinguished the two standards. As will be apparent, the failure is not at issue here because this case turns on the purely legal question concerning the meaning of "political opinion," and whichever standard is applied in this case, the petitioner should prevail. If refugee status is established, we review the denial of asylum for an abuse of discretion. *Vides-Vides*, 783 F.2d at 1466. Because Olimpia applied for asylum after her deportation hearing, her application is also considered a request for withholding of deportation. *See* 8 C.F.R. § 208.3(b).

■ *Analysis.* Neither Immigration Judge Nail nor the Board doubted Olimpia's story. It must be assumed that they found her testimony credible. *See Damaize-Job v. INS*, 787 F.2d 1332, 1338 (9th Cir.1986); *Canjura-Flores v. INS*, 784 F.2d 885, 889 (9th Cir.1985). They reached their unfavorable decision on the basis that Olimpia had not met the legal requirements of the applicable statutes. The questions before us are questions of law, which we review *de novo*.

Persecution is stamped on every page of this record. Olimpia has been singled out to be bullied, beaten, injured, raped, and enslaved. Olimpia's initial acquiescence does not alter the persecutory character of her treatment. That she continued to return to Zuniga's place after his initial attack upon her presents a pattern, all too familiar, of a victim identifying with the aggressor under conditions of terror. She lacked "sufficient ego-strength, self-confidence and willpower" to "escape or cry out for help." *Cf. United States v. Winters*, 729 F.2d 602, 605 (9th Cir.1984) (Pregerson, J.). The persecution has been conducted by a member of the Armed Force, a military power that exercises domination over much of El Salvador despite the staunchest efforts of the Duarte government to restrain it. Zuniga had his gun, his grenades, his bombs, his authority and his hold over Olimpia because he was a member of this powerful military group.

Uncontradicted evidence, then, pointed to both a clear probability of persecution and a well-founded fear of persecution. Olimpia relates that Zuniga said to her that if she ever left him, "[H]e would look for me, for my person, in all El Salvador." El Salvador is a small country. We take judicial notice of reports that persons being deported there from the United States have been tortured and have been killed. We are not in a position to verify these reports. We are in a position to say that they are sufficiently credible to show that Olimpia, the target of a police officer's persecution for her political opinion, would be in serious jeopardy if forced to return to her native land.

Was Olimpia, however, persecuted by an agent of the government because she had a political opinion, or was the relation of Olimpia and Zuniga purely personal? When "political opinion" in the sense used by the two statutes is analyzed, it must mean "the political opinion of the victim as seen by the persecutor." At times in the history of persecution the victims have been persons who did not share the prejudices and enthusiasms of their persecutors. Their opinions have been politically unacceptable only because of the opposition and hostility the persecutors have read into their silence or noncommitment to the persecutors' opinions. Cf. *Bolanos-Hernandez v. INS,* 749 F.2d 1316, 1324 (9th Cir.1985). So in this case, if the situation is seen in its social context, Zuniga is asserting the political opinion that a man has a right to dominate and he has persecuted Olimpia to force her to accept this opinion without rebellion. Zuniga told Olimpia that in his treatment of her he was seeking revenge. But Olimpia knew of no injury she had ever done Zuniga. His statement reflects a much more generalized animosity to the opposite sex, an assertion of a political aspiration and the desire to suppress opposition to it. Olimpia was not permitted by Zuniga to hold an opinion to the contrary. When by flight, she asserted one, she became exposed to persecution for her assertion. Persecution threatened her because of her political opinion.

Olimpia has suffered persecution because of one specific political opinion Zuniga attributed to her. She is, she has been told by Zuniga, a subversive. Her husband left the country, a policeman has been told, because she is a subversive. If she complained of Zuniga, she was informed, she would be killed as a subversive. One cannot have a more compelling example of a political opinion generating political persecution than the opinion that is held by a subversive in opposition to the government. Zuniga viewed Olimpia as having such an opinion.

The opinion, it may be said, is not Olimpia's. It is only imputed to her by Zuniga. And it is imputed by Zuniga cynically. Zuniga knows that Olimpia is only a poor domestic and washerwoman. She does not participate in politics.

Olimpia, however, does have a political opinion, camouflage it though she does. She believes that the Armed Force is responsible for lawlessness, rape, torture, and murder. Such views constitute a political opinion. And she has been persecuted for possessing it. Because she believes that no political control exists to restrain a brutal sergeant in the Armed Force she has been subjected to his brutality. Her subversive doubts about governmental law-abidingness have made her the prey of a hunter of subversives. Characterized as a subversive, she was forced to submit to Zuniga.

■ Even if she had no political opinion and was innocent of a single reflection on the government of her country, the cynical imputation of political opinion to her is what counts under both statutes. In deciding whether anyone has a well-founded fear of persecution or is in danger of losing life or liberty because of a political opinion, one must continue to look at the person from the perspective of the persecutor. If the persecutor thinks the person guilty of a political opinion, then the person is at risk.

Seventeen years ago this basic issue was decided by this circuit. A Yugoslavian citizen, who had refused to work with the Yugoslav secret police, was denied the opportunity to follow his profession as a clerk

in Yugoslavia. He eventually became a cook on a Yugoslavian merchant vessel, which he left to seek asylum in the United States. He had no established political views beyond his unwillingness to be a police informer. The persecution he feared was punishment for defecting from a police state. This court, overruling the Board, recognized that such fear of persecution was fear of punishment on account of a political opinion. *Kovac v. INS*, 407 F.2d 102, 104 (9th Cir.1969) (Browning, J.). The opinion on account of which he would have been punished was the one the masters of Yugoslavia would have attributed to him. So here Olimpia fears persecution on account of the opinion Zuniga attributes to her.

*In re Pierre, supra* at 463, relied on by the Board, is not controlling. Not the slightest suggestion was proferred in that case that the petitioner's husband exercised power over her by cynically imputing subversive political opinion to her. As the Board noted, Pierre did not even allege persecution on account of political beliefs. Nor is *Zayas-Marini v. INS*, 785 F.2d 801 (9th Cir.1986), relied on by the Service on appeal, apposite. That case involved a falling out within the Paraguayan elite. As interpreted by the Board and this court, the reaction of high officials to a complaint of corruption was not a political but a personal matter. The case was decided as one involving purely personal animosity.

Here, when Zuniga manipulatively chooses to regard Olimpia as a subversive, he attributes to her the political opinion of a subversive, and she is being persecuted on account of a political opinion. The fact that Zuniga gave Olimpia the choice of being subjected to physical injury and rape or being killed as a subversive does not alter the significance of political opinion for Olimpia. Because of the status attributed to her by Zuniga and the political opinion that accompanied that status, Olimpia had to suffer the series of indignities that everyone sees as persecution.

Holding, then, as a matter of law that Olimpia Lazo-Majano has suffered persecution on account of political opinion, we find that the Board's order denying her application for the withholding of deportation is not supported by substantial evidence and the Board's order denying her asylum is an abuse of discretion.

REVERSED and REMANDED.

POOLE, Circuit Judge, dissenting:

I would deny Lazo-Majano's petition for review of the Board of Immigration Appeals' rejection of her applications for asylum and withholding of deportation. She may indeed have suffered emotional and physical abuse in the course of her personal relationship with Sergeant Zuniga, but such mistreatment is clearly personal in nature and does not constitute political persecution within the meaning of the immigration laws.

I.

The majority indicates recognition of the standard that we must uphold the denial of an application to withhold deportation if the BIA's decision is supported by substantial evidence. *Chavez v. INS*, 723 F.2d 1431, 1432 (9th Cir.1984); *McMullen v. INS*, 658 F.2d 1312, 1316 (9th Cir.1981). Similarly, the majority acknowledges that we review the BIA's ultimate decision to grant or deny asylum for an abuse of discretion. *Zayas-Marini v. INS*, 785 F.2d 801, 805 n. 12 (9th Cir.1986). However, having intoned these deferential standards of review, the majority has ignored them, reasoning that this case turns on the purely legal question concerning the statutory meaning of "political opinion."

Whether threats or violence constitute political persecution requires analysis of the nature of the threats of violence, including the circumstances and motivation of the alleged persecutor and the alien. *Zayas-Marini*, 785 F.2d at 806; *Hernandez-Ortiz v. INS*, 777 F.2d 509, 516 (9th Cir.1985). "[W]e may look to the political views and actions of the entity or individual responsible for the threats or violence, as well as to the victim's, and we may examine the relationship between the two." *Hernandez-Ortiz*, 777 F.2d at 516. The record here shows a Salvadoran woman,

Lazo-Majano, who was abused and dominated by an individual purely for sexual, and clearly ego reasons. Neither petitioner nor her tormentor was "politically" motivated in any sense contemplated by the laws granting asylum to aliens. The holding that, as a matter of law, Lazo-Majano was persecuted on account of political opinion, is a construct of pure fiction.

## II.

It is the majority's thesis that male chauvinism is itself a political opinion and, male domination, particularly when exercised by any police officer or member of the military, however low of rank, constitutes political persecution. "[Zuniga] is asserting the political opinion that a man has a right to dominate and he has persecuted [Lazo-Majano] to force her to accept this opinion without rebellion." Maj. op. at 1435. The nature of the "persecution" inflicted by Zuniga in imposing this "political opinion" encompasses rape, beatings, and public humiliation, and having her do his laundry.

Quite simply, the majority has outdone Lewis Carroll in its application of the term "political opinion" and in finding that male domination in such a personal relationship constitutes political persecution. Women throughout history and in the world today, as well as males and children, have been, and often remain, victims of mistreatment, injustice, and humiliation. It is the business of enlightened governments to direct their powers toward eliminating such cruelties. It is the mission of the courts to apply faithfully and with some common sense, the rules of law toward these ends. We have laws to redress mistreatment. Congress has also provided relief to aliens who would suffer *political persecution* if ordered back to their countries of origin. But Congress had in mind *genuine* persecution—of those who fall within the definition of "refugees" because of the unavailability to them of the protections of their country, and who are unable or unwilling to seek that protection "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or *political opinion."* 8 U.S.C. § 1101(a)(42)(A). In the discretion of the Attorney General, such alien refugee may be granted asylum. 8 U.S.C. § 1158(a).

Lazo-Majano comes within none of the criteria for refugee status. The statutory concept does not purport to address the general plight of men or women in a particular social order, except as such persons meet the above statutory requirements. Neither does it endeavor to extend the laws of asylum or withholding of deportation to the myriad one-on-one interpersonal conflicts of emotional and physical confrontation not set forth in the statutes.

Just as we have had to make distinctions between the hardship which an alien may face if forced back to an impoverished country, *e.g., Ramerez-Durazo v. INS,* 794 F.2d 491, 498 (9th Cir.1986) (distressed economy of native land not the "extreme hardship" required to establish statutory eligibility for suspension of deportation), so also have we had to distinguish between the "persecution" that may characterize personal relationships, and political persecution against which our immigration laws may provide respite, stay and asylum.

That Zuniga's conduct vis-a-vis Lazo-Majano went unchecked by authority proves little. The record does not show any complaints by her to his military superiors—and his lowly rank suggests that above him was a tower of supervisors—or to other authority. As we said in *Zayas-Marini v. INS,* 785 F.2d 801 (9th Cir.1986) even threats of death made against petitioner, although by two well-placed government officials (one of them Chief of Investigations in control of a paramilitary police unit, and the other Director General of the Paraguayan Water Treatment Program), may, and in that case did, reflect personal differences rather than political disputes, and thus may not qualify one for asylum based on fear of persecution for political reasons.

In *Rebollo-Jovel v. INS,* 794 F.2d 441 (9th Cir.1986) we said that the petitioner failed to qualify for political asylum because nothing in the record indicated that Jovel's interrogation by policemen and

threatening notes left on his car were politically motivated, or that they evidenced anything more than general conditions of unrest and violence in El Salvador. In *Diaz-Escobar v. INS*, 782 F.2d 1488 (9th Cir.1986) we held that a threatening letter alone, without a showing that it was from any political organization, was not sufficient to establish a well-founded fear of persecution. Asylum was likewise denied in *Sanchez-Trujillo v. INS*, 801 F.2d 1571 (9th Cir.1986) (Mere fact that one petitioner had on occasion been detained by security forces and the other had been attacked by several men in civilian clothing was insufficient to demonstrate finding of a well founded fear of persecution to establish eligibility for asylum).

Not as direct on the point, but illustrative of the requirement that the feared treatment must conform to the predicates of the asylum laws are the decisions in *Zepeda-Melendez v. INS*, 741 F.2d 285 (9th Cir.1984) (contentions of El Salvadorian alien that, if deported, he would be persecuted both by El Salvadorian government and local guerillas because his mother owned a house in a strategic location and because he himself was a male of military age who had sworn allegiance to neither faction were insufficient to demonstrate a clear probability of persecution to require withholding of deportation), and *Chavez v. INS*, 723 F.2d 1431 (9th Cir.1984) (tragic and widespread danger of violence affecting all Salvadorians was not "persecution" sufficient to support showing required for political asylum).

The majority finds it crucial that Zuniga was a sergeant in the *Fuerza Armada*. Zuniga had "his authority and his hold over [petitioner] because he was a member of this powerful military group." Maj. op. at 1434. This is an unwarranted enlargement of Zuniga's role and rank and the record here. He was a common, low-grade noncommissioned sergeant. Whatever his boasting and threats to denounce her as a subversive, it is clear that no appearance of official or military authority is shown to have supported his pretension to *force majeure*. He wore a uniform, carried a gun, and used both alternatively to vent upon her his rapacious assault or his pathological display of lover's wooing. In a country engaged in bloody civil war such as El Salvador, where guns and uniforms are plentiful, perhaps a significant portion of the population, male and female, could probably establish political persecution under the majority's test. More disturbing, however, is the facility with which the majority misreads the record. According to the Immigration Judge, petitioner "described Zuniga as a common police officer. He was not a person of rank or authority." Moreover, petitioner testified to her belief that Zuniga would have made the same threats and committed the same violent acts had he not been a member of the *Fuerza Armada*. She also admitted that she would not have sought the assistance of the authorities even if Zuniga had not belonged to that organization.

That he was a member of the local police force played no part in Zuniga's treatment of the petitioner, and certainly did not convert his violent appetites into political motivation. He acted in no official capacity, pursuant to no government policy; and he had no official sanction to "persecute" petitioner as a "real or potential" opponent of the state. Rather, Zuniga acted as an individual, motivated by nothing more than his own "exaggerated *machismo*," the rampaging lust-hate of the common rapist. That this made him a criminal, a brute, and, undoubtedly, a coward, reinforces the justification of the prison system for such predators; it does not become the statutory equivalent of political persecution. *See Zayas-Marini*, 785 F.2d at 806; *compare Hernandez-Ortiz*, 777 F.2d at 516–17 (reasonable to infer that numerous threats and acts of violence directed at members of same family by government forces were politically motivated).

### III.

In addition to the alleged persecution found in Zuniga's conduct, the majority, in this legal *tour de force*, holds that petitioner suffered, and will suffer, persecution because of a specific political opinion attributed to *her*. That is, Zuniga has cynically

imputed to Lazo-Majano the "political opinion" that she is a subversive against the government. By casting this poor woman's submissiveness as political opinion, the majority transforms Zuniga into an alter ego of the "government," depicts his conduct as governmental, and turns him into the wreaker of persecution within the meaning of the asylum statute. That Lazo-Majano is not shown to harbor any political opinion of her own is disregarded; if her tormentor views her as an object for domination, that, in the majority's view, suffices as state-level persecution. *See Hernandez-Ortiz,* 777 F.2d at 517. The fact is, however, that Zuniga did not subject her to repeated humiliations because he saw her as a subversive; nor was she endangered by the government of El Salvador for any political opinion—or any other of the factors which Congress included in 8 U.S.C. section 1101(a)(42). Her peril lay in Zuniga's unrestrained carnal appetites and his total conception of her as an available sexual object. His threats to have her killed as a subversive, if she complained to the authorities, were all for that purpose. *Cf. See Zayas-Marini,* 785 F.2d at 806; *Hernandez-Ortiz,* 777 F.2d at 516. It was as she said, her "person" that he sought. She was a meek and humble domestic, unencumbered by the opinion or status factors which Congress set forth in the statutes. His threats to accuse her were effective because she was unsophisticated enough to believe that this low-grade bully/tyrant might make trouble. But that is not the political attribution contemplated in section 1101(a)(42).

The majority implies that since Zuniga threatened to inform the government that petitioner was a subversive, some serious possibility of government persecution is thereby implicated. *See Hernandez-Ortiz,* 777 F.2d at 517. But this ignores the record's factual findings below. The Immigration Judge specifically found that petitioner

testified that on occasion Zuniga *did* tell other persons that she was a subversive. It is apparent, however, that those persons did not believe Zuniga or take [the] statements seriously. They merely indicated to him that they knew who she was; that she was the person who did his laundry.

Zuniga did more than threaten; on at least one occasion he identified her as a subversive in a public restaurant and said to another member of the *Fuerza Armada,* "[kill] her because she is a guerilla." Nothing happened. Obviously, that fellow member of the *Fuerza Armada,* was less impressed with Sergeant Zuniga than has been the majority here.

The mere making of a threat by one who presents no color of official authority, as was demonstrated here, cannot establish the clear probability of persecution necessary for withholding of deportation. *Bolanos-Hernandez v. INS,* 767 F.2d 1277, 1285 (9th Cir.1984). The probative value of a threat depends upon "whether there is reason to take [it] seriously." *Id.* Moreover, even under the more generous well-founded fear of persecution standard, which an alien must meet to be eligible for a grant of asylum, the fear must have enough of an objective basis that it can be considered "well-founded." *Cardoza-Fonseca v. INS,* 767 F.2d 1448, 1453 (9th Cir.1985), *cert. granted,* — U.S. —, 106 S.Ct. 1181, 89 L.Ed.2d 298 (1986).

Despite the majority opinion's resort to hyperbole and ad hoc generalization, the record does not contain, and the majority does not cite to, a scintilla of evidence that in his treatment of petitioner, Zuniga was aided, supported, or encouraged by any other person or group in positions of control. Lacking evidence, the opinion has set up a novel sort of "judicial notice" by means of which its arguments may be treated as facts, viz.,

El Salvador is a small country. We take judicial notice of reports that persons being deported there from the United States have been tortured and have been killed. We are not in a position to verify these reports. We are in a position to say that they are sufficiently credible to show that Olimpia, the target of a police officer's persecution for her political opinion, would be in serious jeopardy if forced to return to her native land.

Maj. Op. at 1435. The invalidity of the above conclusions is sufficiently manifest to require no further discussion. In this case, although petitioner subjectively may have feared Zuniga, in her proximity to this rapacious man, all the objective evidence indicates that none of his threats with respect to subversion were in fact to be taken seriously. Thus, petitioner showed no actual danger of actual persecution by the government, and no objectively perceivable jeopardy because of any political opinion which Zuniga could falsely attribute to her.

### IV.

A final political opinion advanced by the majority, the only "opinion" possibly held by the petitioner, is said to be her belief that the military in El Salvador has made it a place of violence and lawlessness. While doubts about the government's ability to control the military might constitute a political opinion, petitioner was not persecuted by the government for holding such beliefs; she was not bullied and attacked by Zuniga for that reason; and such belief was not the well-founded fear of persecution by the government or of controlling other components.

In the majority's view, the "persecution" inflicted on petitioner for believing that the government could not control the military was mistreatment at the hands of Zuniga. But that is not what she thought. She testified that Zuniga would have acted the same way, and she would not have complained to the authorities, even if he was not a member of the local parapolice. She feared this violent man for what he had done to her; she understood his lust for personal gratification. She did not take his abuse merely because on any objective basis she perceived government-sanction for his acts. But this lacuna has not deterred the majority's free-wheeling, wide-ranging creation of political persecution. The opinion says:

> The persecution has been conducted by a member of the Armed Force, a military power that exercises domination over much of El Salvador despite the staunchest efforts of the Duarte government [1] to restrain it. Zuniga had his gun, his grenades, his bombs, his authority and his hold over Olimpia because he was a member of this powerful military group.

Again petitioner's passive nature made her more vulnerable as his victim, but her "beliefs" were not the reason for his actions.

### V.

Although Zuniga is obviously a violent and jealous man, the "enslaved" existence described by the majority is not altogether clear. There is some support in the record for another picture of this relationship. Petitioner never complained to any authority. We do not have any record on which to conclude that official intervention would not have been at hand if she had done so. For a long while petitioner made no attempt to get away from Zuniga; she kept returning to his apartment, and submitting to his desires. The Immigration Judge consequently found "compelling evidence that the relationship was not involuntary." The majority, however, dismisses this finding by the trier of fact and holds that Lazo-Majano's conduct presents merely the familiar pattern "of a victim identifying with the aggressor under conditions of terror." Maj. op. at 1434. Again, this impinges upon our proper standard of review since the evidence supporting the Immigration Judge reasonably supports his conclusion. For example, on one occasion he struck her during an argument; when he returned shortly afterwards he saw that her eye was injured, he insisted that she go with him to

---

**1.** This example of inserting privately held political opinion seems glaringly inappropriate. Just which elements in the troubled lands of El Salvador, Nicaragua and Honduras may be deemed to exemplify the best or worst of human compassion, decency and rectitude, is a subject upon which quite reasonable people may disagree. The judges of the majority are certainly entitled to the personal assessment of the present regime in El Salvador which they have stated here. But it is most unfortunate that they utilize the vehicle of an opinion of this court to convey their protected personally-held views.

a doctor for treatment. This made him no less brutal, but did indicate some personal concern. At some time she actually lived with Zuniga's sister and told the latter about her relationship with him. The Immigration Judge concluded from her testimony that the sister correctly assumed that petitioner and Zuniga were "sweethearts." The evidence indicates that this was also Zuniga's feeling. The last time they were together, Zuniga asked her to go with him to his parent's home because he wanted her to meet them. Assuming that petitioner was indeed subjected to sustained mistreatment by this ungainly male, substantial evidence supports the Immigration Judge's conclusion that on the whole, their love-hate relationship was not all involuntary, even if often violent.

## VI.

An alien has the burden of proof that she is eligible for asylum or withholding of deportation. *Zayas-Marini,* 785 F.2d at 805, and we should be constrained by a sober acceptance of our limited role. Perhaps a reasonable fact-decider could have found the facts of this case such as to justify the conclusion that petitioner should be allowed to remain here; but *that* is not the role of this court for we did not see her and did not have the duty of weighing the evidence. Ours is the role of the reviewing court, and our function is not one of making the agency's determination.

The BIA and the Immigration Judge could reasonably conclude that the narrative presented by Lazo-Majano does not constitute a *prima facie* case either of a clear probability that her life would be threatened on account of her political opinion, or a well-founded fear of political persecution.

I believe that the rationale adopted by the majority for rejecting the sensible determination of the Immigration Judge and the BIA is unacceptable and is contrary to law and precedent. I would deny the petition for review.