**Jose Roberto CANAS–SEGOVIA; Oscar Iban Canas–Segovia, Petitioners,***

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 88–7444.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 12, 1989.

Decided April 24, 1990.

* Briefs of amici curiae in support of petitioners were filed for the Office of the United Nations High Commissioner for Refugees by *Guy S. Goodwin–Gill, Susan Timberlake,* United Nations High Commissioner for Refugees, Washington, D.C., and *Ralph G. Steinhardt,* George Washington University National Law Center, Washington, D.C.; and for Amnesty International U.S.C. by *Paul Hoffman,* and *David Weissbrodt,* AIUSA Legal Support Network, Amnesty International U.S.A., Los Angeles, California, and *Charles R. Dougherty* and *Neil V. McKittrick,* Hill & Barlow, Boston, Massachusetts.

Karen Musalo, University of San Francisco Law Clinic, San Francisco, Cal., for petitioners.

Allen W. Hausman, Office of Immigration Litigation, Washington, D.C., for respondent.

Charles R. Dougherty, Neil V. McKittrick, Boston, Mass., Paul Hoffman, David Weissbrodt, Los Angeles, Cal., for Amnesty Intern. U.S.A., amicus curiae.

Guy S. Goodwin–Gill, Susan Timberlake, United Nations High Com'r for Refugees, Washington, D.C., Ralph G. Steinhardt, George Washington University Nat. Law Center, Washington, D.C., for amicus curiae.

Before WRIGHT, HUG, and LEAVY, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

We consider whether El Salvador's forcible conscription policy amounts to persecution under the Immigration and Nationality Act (INA) when applied to conscientious objector Jehovah's Witnesses. Both the immigration judge (IJ) and Board of Immigration Appeals (BIA) answered this query in the negative when they denied asylum and withholding of deportation relief to petitioners Jose and Oscar Canas–Segovia. We now REVERSE and REMAND with instructions to grant the requested relief.

## BACKGROUND

Jose and Oscar Canas–Segovia (the Canases) are brothers and natives of El Salvador whose religious beliefs bar them from participating in military service. Both were introduced to the Jehovah's Witnesses faith as children and reared in a family setting where most family members either already were Jehovah's Witnesses or studying to be baptized into that faith. The Canases have studied the faith since their midteens, with the goal of becoming baptized and consider themselves to be Jehovah's Witnesses. The tenets of their faith prohibit them from participating in military service of any kind.

El Salvador presently has a policy of mandatory military service for all males between the ages of 18 and 30. The Salvadoran policy does not exempt conscientious objectors, on religious grounds or otherwise, and offers no alternatives to military service. The legal penalties for resisting conscription range from six months to 15 years imprisonment, depending upon individual circumstances. Fear of this policy caused the Canases to flee El Salvador at the respective ages of 16 and 17.

The Canases entered the United States illegally on January 26, 1985. Two days later, they received orders to show cause why their illegal entry should not subject them to deportation. At a joint deportation hearing held in San Francisco on December 16, 1985, they submitted petitions for asylum pursuant to section 208 of the INA, codified at 8 U.S.C. § 1158(a).[1] Their petitions raised these grounds for asylum: (1) forcible conscription in violation of their religious beliefs amounted to religious persecution, (2) refusal to serve in the military, for any reason, would expose them to extrajudicial sanctions including torture and death, and (3) refusal to serve in the military could cause them to be viewed as political enemies of the government and again expose them to extrajudicial sanctions. Pursuant to 8 C.F.R. § 208.3(b), the IJ automatically considered the petitions also as requests for withholding of deportation under section 243(h) of the INA, codified at 8 U.S.C. § 1253(h).

In support of their petitions, the Canases presented extensive evidence about the Salvadoran conscription policy and the consequences of refusing to submit to it. A few examples will suffice. Jose Canas testified that a friend who had fled from the military and returned to his neighborhood was taken away and not seen again. An affidavit was presented from an eyewitness to the extrajudicial torture of an Army deserter. The eyewitness, a conscript himself, first heard army officials accuse the deserter of being an antigovernment guerrilla and then watched as both of the deserter's arms were chopped off.

---

1. For the purposes of ease of reading and judicial efficiency, parallel citations to both the INA section and U.S.C. section will appear only the first time a section is cited. Later citations will be only to the U.S.C.

Affidavits and declarations were also presented by former Salvadoran military officers, a Red Cross physician working in the country, and members of the clergy working there. An affidavit from an expert on the human rights situation in El Salvador, George McHugh, stated that "[t]he government routinely rounds up youths at gun point. Those who refuse to join the armed forces for reasons of conscience are tortured and killed." [2]

The IJ denied the petitions for asylum and withholding of deportation and granted the Canases voluntary departure. In an oral decision, he reasoned that the Canases could not establish either a clear probability of persecution [3] or a well-founded fear of persecution [4] because they had failed to show that Jehovah's Witnesses are singled out by the Salvadoran government for persecution because of their religious beliefs.

The IJ considered a document from the United Nations High Commissioner for Refugees Office (UNHCR) in support of the Canases' claim. It cited to the *UN Handbook on Procedures and Criteria for Determining Refugee Status* (Geneva 1979) (Handbook). The IJ dismissed the document, saying that the Handbook was written before passage of the Refugee Act of 1980. Noting also that 39 other nations fail to provide for conscientious objector exemptions, he concluded that the Salvadoran policy of mandatory conscription could not amount to persecution because it applied equally to all Salvadorans without regard to religious beliefs. The Canases then appealed to the BIA.

That board affirmed the denial of asylum and withholding.[5] It emphasized that the Canases had failed to prove intent on the part of the Salvadoran government to single out Jehovah's Witnesses for persecution, and determined the Handbook provisions were not dispositive.

It also rejected the Canases' argument that refusing to serve in the military would impute to them a political opinion hostile to the government, thereby exposing them to governmental reprisals including torture and death. Rejection of this argument was based upon a prior BIA decision in which a petitioner had failed to establish that mere failure to serve in the military would subject him to the attention of Salvadoran death squads.

This appeal followed.

## STANDARD OF REVIEW

■ Our review is confined to the decision of the BIA. If its determination was correct, then any error by the IJ is harmless. *Rodriguez–Rivera v. U.S. Dep't. of Immigration & Naturalization*, 848 F.2d 998, 1003 (9th Cir.1988).

■ We review factual findings underlying the BIA's denial of asylum and withholding of deportation relief under the substantial evidence standard. *Desir v. Ilchert*, 840 F.2d 723, 726 (9th Cir.1988); *Artiga Turcios v. I.N.S.*, 821 F.2d 1396, 1398 (9th Cir.1987). The facts in our case were undisputed and the BIA decision turned solely on legal questions about the relevant statutory requirements. Our review is de novo. *Desir*, 840 F.2d at 723; *Lazo–Majano v. I.N.S.*, 813 F.2d 1432, 1434 (9th Cir. 1987).[6]

---

**2.** Declaration of George McHugh, Record at 397.

**3.** The "clear probability of persecution" standard is used in determining an alien's eligibility for withholding of deportation. *I.N.S. v. Stevic*, 467 U.S. 407, 424, 104 S.Ct. 2489, 2498, 81 L.Ed.2d 321 (1984); *Blanco–Lopez v. I.N.S.*, 858 F.2d 531, 533 (9th Cir.1988).

**4.** The "well-founded fear of persecution" standard is used in determining an alien's eligibility for asylum relief. *See* section 101(a)(42) of the INA, codified at 8 U.S.C. § 1101(a)(42).

**5.** Both the IJ and BIA focused on whether the Canases met the asylum standard of a well-founded fear of persecution. Because they determined that the Canases failed to meet this standard, they a fortiori did not need to consider whether the Canases met the more difficult withholding of deportation standard that requires a clear probability of persecution.

**6.** The Government urges us to apply a deferential standard of review to the BIA's decision, arguing that we must defer to its interpretation of the statute. We reject this argument. As the Supreme Court noted in *I.N.S. v. Cardoza Fonseca*, "[t]he judiciary is the final authority on issue

## STATUTORY FRAMEWORK

Both the asylum and withholding of deportation provisions were established by the 1980 Refugee Act in which Congress sought to bring United States refugee law into conformity with the United Nations Protocol Relating to the Status of Refugees (UN Protocol), 19 UST 6223, TIAS No. 6577. *See generally I.N.S. v. Stevic,* 467 U.S. 407, 421, 104 S.Ct. 2489, 2496, 81 L.Ed.2d 321 (1984); *I.N.S. v. Cardoza Fonseca,* 480 U.S. 421, 436–37, 107 S.Ct. 1207, 1216, 94 L.Ed.2d 434 (1987). The UN Protocol, to which the United States acceded in 1968, binds parties to the substantive provisions of Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees (1951 Convention), 189 U.N.T.S. 150 (July 28, 1951).[7]

An alien qualifies for discretionary granting of asylum relief under section 208(a) of the INA, codified at 8 U.S.C. § 1158(a), if he is a refugee within the meaning of section 101(a)(42) of the INA, codified at 8 U.S.C. § 1101(a)(42). That section, in relevant part, defines a refugee as:

> (A) any person who is outside any country of such person's nationality ..., and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion....

8 U.S.C. § 1101(a)(42)(A).[8]

The withholding of deportation provision, 8 U.S.C. § 1253(h), mandates that no alien shall be deported to a country in which his or her life or freedom would be threatened on account of any of five enumerated grounds. The section states in relevant part:

> The Attorney General shall not deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1253(h)(1).

 An alien becomes eligible for withholding of deportation by demonstrating a "clear probability of persecution" on account of one of these five grounds. *Stevic,* 467 U.S. at 424, 104 S.Ct. at 2498; *Blanco–Lopez v. I.N.S.,* 858 F.2d 531, 533 (9th Cir.1988). The "clear probability" standard inquires whether it is "more likely than not that the alien [will] be subject to persecution." *Stevic,* 467 U.S. at 414, 104 S.Ct. at 2493; *Blanco–Lopez,* 858 F.2d at 533. The standard may be satisfied by the alien's own credible testimony, and independent, corroborative evidence of persecution is unnecessary in light of such credible testimony. *Blanco–Lopez,* 858 F.2d at 533.

 Although asylum and withholding of deportation relief are usually sought simultaneously, the two forms of relief differ in several respects. Withholding of deportation is mandatory once an alien establishes eligibility but the granting of asylum remains discretionary even after he establishes eligibility. *Compare* 8 U.S.C. § 1253(h) *with* 8 U.S.C. § 1158(a); *see generally Cardoza Fonseca,* 480 U.S. at 428 n. 6, 107 S.Ct. at 1211 n. 6. The benefits also differ. Withholding of deportation only protects an alien from deportation to a specific country while asylum allows him to have his status adjusted to that of a lawful permanent resident.[9] *Cardoza Fonseca,*

---

of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." 480 U.S. 421, 446–48, 107 S.Ct. 1207, 1220–21, 94 L.Ed.2d 434 (1987) (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984)).

**7.** The United States is not a party to the 1951 Convention.

**8.** The definition of refugee adopted by Congress in the aslyum section, and the bases of harm enumerated in the withholding section, are virtually identical to the definition of "refugee" in the 1951 Convention. *Cardoza Fonseca,* 480 U.S. at 436–37, 107 S.Ct. at 1216.

**9.** This provides strong incentive for aliens to seek asylum relief in addition to withholding of

480 U.S. at 428 n. 6, 107 S.Ct. at 1211 n. 6 (quoting *Matter of Salim*, 18 I & N Dec. 311, 315 (1982)). The clear probability of persecution standard required for withholding of deportation is more difficult to meet than the well-founded fear standard required for asylum. *Cardoza Fonseca*, 480 U.S. at 423, 450, 107 S.Ct. at 1208, 1222; *Stevic*, 467 U.S. at 425, 104 S.Ct. at 2498; *Blanco–Lopez*, 858 F.2d at 533.

## ANALYSIS

This appeal presents four primary issues: (i) whether application of the Salvadoran conscription policy to the Canases is persecution under the INA; (ii) whether conscientious objectors may qualify for asylum and withholding of deportation relief; (iii) whether the BIA erred by requiring the Canases to demonstrate intent and motive to persecute by the Salvadoran government; and (iv) whether the merits of the Canases' claims entitle them to relief. We address these issues seriatim.

## I

Both asylum and withholding of deportation relief are cut from the common cloth of persecution. Absent persecution, or fear of it, on account of an alien's race, religion, nationality, membership in a particular social group, or political opinion, an alien cannot qualify for either form of relief. Here, if application of the conscription policy to the Canases does not amount to persecution on account of one or more of

the statutory grounds, then we need go no further.

■ The BIA determined that the Salvadoran conscription policy cannot constitute persecution because it applies equally to all Salvadorans without regard to race, religion, nationality, membership in a particular social group or political opinion. We disagree.

### *Conscription & Persecution*

■ The BIA gave great weight to the facially neutral characteristics of the Salvadoran conscription policy.[10] Because nearly all conscription policies will appear facially neutral, the BIA's reasoning effectively means that no such policy can ever result in persecution within the meaning of the INA. Such a result ignores an elementary tenet of United States constitutional law, namely, that a facially neutral policy nonetheless may impermissibly infringe upon the rights of specific groups of persons.[11] This tenet has been deemed particularly important where religion is concerned.[12]

For example, in *Wisconsin v. Yoder*, the Supreme Court wrote that "a regulation neutral upon its face may, in its application, nonetheless offend the constitutional requirement for government neutrality if it unduly burdens the free exercise of religion." 406 U.S. 205, 220, 92 S.Ct. 1526, 1535, 32 L.Ed.2d 15 (1972). Similarly, the Supreme Court has exempted personal choices born of religious motivations from

deportation relief. *See Artiga Turcios v. I.N.S.*, 829 F.2d 720, 724 (9th Cir.1987).

10. At page 12 of its opinion, the BIA stated:
[t]he respondents also do not claim that the Salvodoran ... conscription laws are applied in a manner that discriminates based upon an individual's "race, religion, nationality, membership in a particular social group, or political opinion."
Similarly, at page 15, the BIA stated:
[A] reasonable person in the position of the respondents might fear persecution for a refusal to perform military service but would not believe that he had been punished on account of his religious beliefs where the same penalties are applied to all violators, regardless of the reasons for the refusal to serve.

11. While we do not suggest that United States constitutional law is binding upon the Salvadoran government, we do believe that United States jurisprudence is relevant to analysis of new issues of United States refugee law. Here we consider solely whether the Canases are entitled to relief afforded under United States refugee law.

12. Although the principle also is at work in equal protection jurisprudence, those cases differ crucially from freedom of religion cases because the equal protection clause requires proof of discriminatory intent. *E.g., Village of Arlington Heights v. Metropolitan Housing Dev.*, 429 U.S. 252, 265–70, 97 S.Ct. 555, 563–66, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976).

otherwise valid and neutral state regulation. *E.g.*, *Thomas v. Review Bd.*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (Jehovah's Witness entitled to employment benefits when he left job in weapons plant due to religious convictions); *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (Seventh Day Adventist whose religion prevented work on Saturday not barred from receiving employment benefits).

Applying the principle embodied in these cases, we conclude that the mere facial neutrality of the Salvadoran conscription policy does not preclude it from amounting to persecution under the INA. Whether persecution results in a given case depends on the circumstances and characteristics of the affected aliens. We next consider the circumstances and characteristics of the affected aliens in this case.

## II

The Canases assert that application of the conscription policy to them results in persecution because of their religion's requirement of pacifism. They argue that the asylum and withholding of deportation provisions afford relief to aliens such as themselves whose genuine religious, moral or other genuine beliefs dictate that they be conscientious objectors to military service.

No specific provision is made for conscientious objectors within the INA or the UN Protocol with which the asylum and withholding provisions are meant to conform. The Canases, however, contend that conscientious objectors are nevertheless encompassed within the relief afforded by those provisions. They rely upon the UN Handbook to support their argument.

■ Although the BIA considered the relevant Handbook provisions, it dismissed them as ambiguous and not dispositive.[13] We disagree. The Handbook unambiguously supports the Canases' claims.

### Conscientious Objectors & Persecution

The Handbook is published by the Office of the United Nations High Commissioner for Refugees (UNHCR) for the purpose of providing guidance to governments about "procedures and criteria for determining refugee status." UN Handbook Preface at 1. Because the requirements for establishing refugee status, the prerequisite for gaining asylum relief, are identical to those for establishing entitlement to withholding of deportation,[14] the Handbook's instruction is useful in determining both asylum and withholding of deportation claims.

Both the Supreme Court and this court have looked to the Handbook for guidance in determining refugee status, and consider it to be authoritative on the subject. *E.g.*, *Cardoza Fonseca*, 480 U.S. at 438–39 & n. 22, 107 S.Ct. at 1216–17 & n. 22 (Handbook provides "significant guidance in construing Protocol"); *Artiga Turcios*, 821 F.2d at 1400 (using Handbook procedures in evaluating impact of alien's false statements upon refugee status); *Hernandez–Ortiz v. I.N.S.*, 777 F.2d 509, 517 (9th Cir.1985) (Handbook's guidance in determining imputed political opinion); *McMullen v. I.N.S.*, 658 F.2d 1312, 1319 (9th Cir.1981) (citing Handbook for proposition that refugees are limited in ability to present evidence of persecution). The BIA also looks to the Handbook for guidance. *E.g.*, *Matter of Vigil*, Int. Dec. 3050 (BIA 1980); *Matter of A.G.*, Int. Dec. 3040 (BIA 1987);

**13.** We note that the IJ declined to follow the UN Handbook because it had been published prior to the passage of the 1980 Refugee Act. The IJ's concern was unfounded, however, because Congress had knowledge of the standards contained in the UN Handbook at the time it passed the 1980 Refugee Act. *See M.A. A26851062 v. U.S. I.N.S.*, 858 F.2d 210, 214–15 n. 3 (4th Cir.1988). The Department of Justice, too, has noted the likelihood that Congress intended the standards within the UN Handbook to serve as an interpretive guide to the 1980 Refugee Act. *Id.* (citing U.S. Refugee Program: Oversight Hearings Before the Subcommittee on Immigration, Refugees, and International Law of the House Comm. on the Judiciary, 97th Cong., 1st Sess. 24, 26 (1981) (Memorandum from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, to David Crossland, General Counsel, Immigration and Naturalization Service)).

**14.** *Compare* 8 U.S.C. § 1253(h) *with* 8 U.S.C. § 1101(a)(42).

*Matter of Acosta,* Int. Dec. 2986 (BIA 1985).

The relevant Handbook paragraphs appear under the heading of a section entitled "Deserters and persons avoiding military service," and include paragraphs 167–174. When read in toto, this entire section emphasizes that refusal to perform military service on account of genuine reasons of conscience may be a basis for refugee status.[15]

For example, paragraph 172 reads:

172. Refusal to perform military service may also be based on religious convictions. If an applicant is able to show that his religious convictions are genuine, and that such convictions are not taken into account by ... his country in requiring him to perform military service, he may be able to establish a claim to refugee status. Such a claim would, of course, be supported by any additional indications that the applicant or his family may have encountered difficulties due to their religious convictions.

The BIA apparently read the last sentence of paragraph 172 as a limitation upon the rest of the paragraph. It opined:

The respondents did not make any showing that their family members had "encountered difficulties" in El Salvador because of their religious beliefs. Thus, the core of the respondent's argument is that they are "refugees" under the protocol because they are conscientious objectors who come from a nation with compulsory military service. We decline to construe the refugee definition contained in the protocol in such a broad manner, although the UNHCR has advised that its position is that persons such as the respondents "may be accorded refugee status" under the protocol. BIA Opinion at 11 (footnotes omitted).

■ This construction of paragraph 172 imposes upon the Canases the burden of demonstrating previous difficulties due to their religious convictions before they can gain refugee status on the basis of religious persecution. Imposition of such a burden is illogical as it would preclude those persons experiencing first time religious persecution from gaining refugee status. A natural reading of the last sentence indicates that evidence of other difficulties stemming from religious persecution will buttress a claim but lack of such evidence does not bar it.

Even if this sentence is ambiguous, it should be construed liberally, not restrictively, in light of the body of the paragraph and other relevant sections. For example, paragraph 170 states that there are cases in which "the necessity to perform military service may be the sole ground for a claim to refugee status, i.e., when a person can show that the performance of military service would have required his participation in military action contrary to his genuine political, religious or moral convictions, or to valid reasons of conscience."

Nor do we find persuasive the BIA's conclusion that Handbook paragraph 173 mandates that this issue be left to the legislation of individual governments rather than being a question of legal rights under the Protocol.[16] Paragraph 173 simply suggests that the granting of refugee status to conscientious objectors is all the more reasonable in light of the growing trend in international law of recognition of

---

**15.** Only refusal based upon the mere dislike of military service or fear of combat is rejected as a basis for refugee status. *See* Handbook ¶ 168.

**16.** Paragraph 173 reads:

The question as to whether objection to performing military service for reasons of conscience can give rise to a valid claim to refugee status should also be considered in light of more recent developments in this field. An increasing number of States have introduced legislation or administrative regulations whereby persons who can invoke genuine reasons of conscience are exempted from military service, either entirely or subject to their performing alternative (i.e. civilian) service. The introduction of such legislation or administrative regulations has also been the subject of recommendations by international agencies. In the light of these developments, it would be open to the Contracting States, to grant refugee status to persons who object to performing military service for genuine reasons of conscience.

(footnote omitted).

conscientious objector status. Thus, it too supports the Canases' claims.[17]

■ We conclude that the BIA erred as a matter of law in determining that conscientious objectors who face punishment as a result of their refusal to perform military service cannot demonstrate persecution within the meaning of the INA. A conscientious objector is one whose actions are governed by conscience, and persecution arises whenever that conscience is overcome by force or punishment meted out for the refusal to betray it. We hold that punishment of a conscientious objector for refusal to comply with a policy of mandatory conscription may amount to persecution within the meaning of the INA, if the refusal is based upon genuine political, religious, or moral convictions, or other genuine reasons of conscience.

## III

The Canases contend the BIA applied an incorrect standard in assessing their claims when it required the Canases to demonstrate motive or intent to persecute on the part of the Salvadoran government. We agree.

### Intent & Motive to Persecute

■ We have stated previously that a showing of well-founded fear requires examination of both the asylum seeker's subjective fear of persecution as well as an examination of the objective nature of the articulated reason underlying the fear. *Rodriguez–Rivera*, 848 F.2d at 1001. In short, the subjective component requires the alien's fear to be genuine while the objective component requires that the fear be reasonable. *Id.* at 1003.

The BIA has utilized a similar standard, stating that a well-founded fear of persecution is established when an applicant "show[s] that a reasonable person in his circumstances would fear persecution." *Matter of Mogharrabi*, Int. Dec. 3028 at 9 (BIA 1987).[18]

■ Neither of these standards requires an asylum applicant to establish the persecutor's intent or motive. Intent or motive to persecute is merely one relevant consideration in the analysis of an asylum claim. *E.g., Lazo–Majano v. I.N.S.*, 813 F.2d at 1435; *Hernandez–Ortiz*, 777 F.2d at 516. Here, however, the BIA transformed these relevant factors into requirements.[19]

For example, on page 14 of its opinion, the BIA says:

> [A]lthough the respondents may view any penalty that they receive for their refusal to serve as punishment for their religious beliefs, we do not consider that punishment to constitute persecution, within the meaning of the Refugee Act and cases interpreting that Act, in *the absence of a showing that the government's motivation for imposing the punishment stems from the respondent's religious beliefs* ....

(Emphasis added.)

On page 15, it states:

> Since *respondents have not shown that the Salvadoran government is inclined to persecute* Jehovah's Witnesses or that the government is aware of the respondent's religious beliefs, the government would presumably punish the respondents just as it would punish any other

---

**17.** The Canases also correctly point out that paragraph 173 has never before posed an obstacle to the BIA's application of Handbook provisions to refugee claims by draft resisters.

**18.** We express no opinion about whether the BIA's "reasonable person" standard is consistent with our two-part test articulated in *Rodriguez–Rivera*, 848 F.2d at 1001. That issue is not before us.

**19.** The BIA's opinion primarily addressed whether the Canases met the "well-founded

fear" standard for establishing an asylum claim and did not devote separate consideration to the withholding of deportation claim. This approach was appropriate because if a petitioner cannot satisfy the easier well-founded fear standard, then he certainly cannot satisfy the more difficult clear probability of persecution standard required for withholding of deportation. *Diaz–Escobar v. I.N.S.*, 782 F.2d 1488, 1491 (9th Cir.1986).

Salvadoran who refused to comply with the conscription process ...

(emphasis added).

The last sentence of the same paragraph reads:

In this regard, the *respondents have not demonstrated* that the Salvadoran government would regard the fact that the respondents have religious reasons for their refusal to serve in the military as anything but a matter of conscience.

(Emphasis added.)

█ These excerpts indicate that the BIA required the Canases to demonstrate intent or motive to persecute on the part of the Salvadoran government. No good reason exists to impose such a requirement upon refugee claimants. Bona fide refugees already face logistical problems in gathering evidence due to their being outside of the country where the alleged persecution occurred. *See Bolanos–Hernandez v. I.N.S.*, 749 F.2d 1316, 1325 (9th Cir. 1984) ("authentic refugees rarely are able to offer direct corroboration of specific threats.").[20] Evidence of proof of intent and motive would be particularly hard to provide because both involve proof of a persecutor's state of mind. We have said that "[p]ersecutors are hardly likely to provide their victims with affidavits attesting to their acts of persecution." *Id.* at 1325.

The BIA's requirement that the Canases demonstrate proof of intent or motive to persecute was an erroneous and unsupported departure from precedent and is reversible error.[21]

## IV

█ Having corrected the BIA's legal errors, we could now remand for application of the identified legal standards. Remand in this case, however, would serve no

purpose because the facts are undisputed. *See Maldonado–Cruz v. Dep't. of Immigration & Naturalization*, 883 F.2d 788, 792 n. 7 (9th Cir.1989).

### Merits

In our concern for efficiency, we consider first the Canases' claims under the more stringent clear probability of persecution standard required for withholding of deportation. If this more difficult standard can be met, then the more generous well-founded fear standard required for asylum will be met a fortiori. *Bolanos–Hernandez*, 749 F.2d at 1322.

### A. Religious Persecution

█ The record reveals that both the IJ and BIA determined that the Canases had genuine religious convictions which prevent them from performing military service. The record also reveals that the Salvadoran conscription policy allows no exemption for religious reasons and refusal to serve results in punishment by imprisonment. Under the Salvadoran conscription policy, if the Canases refuse to do military service, then they will go to prison. Any reasonable person in this position would conclude that the punishment would be on account of his religious beliefs.

The result is that if the Canases follow their religious beliefs and refuse to do military service, they will suffer imprisonment. This adds up to a clear probability of persecution on account of religious beliefs because it is "more likely than not," *Stevic*, 467 U.S. at 414, 104 S.Ct. at 2493; *Blanco–Lopez*, 858 F.2d at 533, that the Canases will suffer imprisonment due to their religious convictions. *See* Handbook ¶¶ 167–174.

**20.** Similarly, the UN Handbook suggests that the "*requirement of evidence should not be too strictly applied* in view of the difficulty of proof inherent in the special situation in which an applicant for refugee status finds himself." Handbook ¶ 197; *accord* ¶ 196 (applicant statements should be given benefit of doubt as to credibility because of difficulty of corroboration).

**21.** We note that in footnote 11 of its opinion, the BIA states that "[a]sylum applicants need not prove a government's 'subjective' intent to persecute ... Reasonable inferences can be drawn from governmental or individual actions." Although this is a correct statement of the law, we find it at odds with the text of the opinion.

## B. Persecution on Account of Imputed Political Opinion

The Canases also assert that their refusal to perform military service will be viewed as political opposition to the government. They argue that, as possessors of an imputed political opinion that is opposed to the government, they will be exposed to extra-judicial sanctions including torture and death.

In rejecting their claim of persecution on account of imputed political opinion, the BIA relied upon its earlier decision in *Matter of A–G*, Int. Dec. 3040 (BIA 1987), and said:

> We rejected a similar argument in *Matter of A–G*. In that case we found that a Salvadoran who claimed that he would be tortured or killed by "death squads" if returned ... had not established that "mere failure to serve in the military is the kind of activity which draws the attention of the persons who carry out these killings."

BIA Opinion at 17 (citations and footnote omitted).

The BIA's reliance upon *Matter of A–G* is misplaced. First, the Canases are entitled to a determination of the probability of persecution of themselves, not of others. *Kovac v. I.N.S.*, 407 F.2d 102, 105 (9th Cir.1969). The BIA merely summarized, in a footnote, the evidence offered by petitioners. BIA Opinion at 16 n. 3. It drew no conclusions from the evidence and attempted no analysis.[22]

Second, *Matter of A–G* is distinguishable. That alien presented no evidence linking a failure to serve in the military with torture or death. *Matter of A–G*, Int. Dec. 3040 at n. 7. Instead, he presented only general evidence of torture and executions carried out by Salvadoran "death squads." *Id.* Here, nearly all of the Canases' evidence relates directly to the consequences either of refusal to do military service or of a perceived refusal to do. it.

Nor did the alien in *Matter of A–G* present evidence or argue that his punishment for refusing to serve in the military constituted religious persecution. Indeed, the BIA specifically noted that although it is generally true that a requirement of military service is not persecution, an exception exists in:

> those rare cases where a disproportionately severe punishment would result on account of one of the five grounds enumerated in ... the Act....

*Id.* at 6.

This is one of those rare cases. A Salvadoran who prefers not to serve in the military for reasons not amounting to genuine reasons of conscience (for example, fear of combat) does not suffer disproportionately greater punishment when his will is overcome by being forcibly conscripted. By comparison, however, the Canases suffer disproportionately severe punishment when forced to serve in the military because that service would cause them to sacrifice their religion's fundamental principle of pacifism.

The Canases' refusal to do military service because of their religious beliefs also necessarily places them in a position of political neutrality in the Salvadoran civil conflict.[23] *Bolanos–Hernandez*, 749 F.2d at 1324–25. An expression of political neutrality is no less an expression of political opinion than is the decision to affiliate with an organized political faction. *Vides–Vides v. I.N.S.*, 783 F.2d 1463, 1466–67 n. 2 (9th Cir.1986) (desire to join neither side was "political opinion"). "Just as a nation's decision to remain neutral is a political one, so is an individual's." *Bolanos–Hernandez*, 749 F.2d at 1324–25 (citing Neutrality Act of 1939, 22 U.S.C. §§ 441–465 (1982)).

---

**22.** At oral argument, counsel for the government argued that the BIA was entitled to take judicial notice of the facts in *Matter of A–G*. This argument is nonsensical and we reject it.

**23.** We are also influenced by the UNHCR's argument that a refusal to bear arms is a uniquely political statement. UNHCR Brief at 31–36. Such a perspective naturally requires the viewing of any conscientious objection to military service as an inherently political opinion. *Accord Bolanos–Hernandez*, 749 F.2d at 1324–25; *Vides–Vides*, 783 F.2d at 1466–67 n. 2.

Because the Canases clearly have adopted a stance of political neutrality, it remains only for us to determine whether the evidence presented indicates that such a stance results in a clear probability of persecution. We conclude that it does.

The Canases presented voluminous and convincing evidence that persons who refuse to comply with the Salvadoran conscription policy are exposed to severe dangers, including torture and death. The specifics were set forth earlier, see supra p. 720, and need not be repeated. This evidence demonstrates a clear probability of persecution on account of imputed political opinion because the Canases' refusal to serve in the military will "more likely than not" subject them to extrajudicial sanctions. Stevic, 467 U.S. at 414, 104 S.Ct. at 2493; Blanco–Lopez, 858 F.2d at 533.

## CONCLUSION

We hold on the record established that the Canases qualify for asylum and withholding of deportation relief because their refusal to serve in the military is based on genuine reasons of conscience and because such refusal will more likely than not subject them to imprisonment, and possibly torture and death on account of their religious beliefs and imputed political opinion. We base this holding in large part upon relevant provisions of the UN Handbook that urge the granting of refugee status to conscientious objectors when their country's conscription policy allows no exemptions or alternatives to military service and when the refusal to perform military service is based upon genuine reasons of conscience.

We REVERSE the BIA's denial of asylum and withholding of deportation relief and instruct that withholding of deporation relief be granted. We REMAND the case to the BIA to exercise its discretion with respect to the asylum relief.

LEAVY, Circuit Judge, special concurrence:

I concur in Part IV.B of the opinion which holds that the Canases are qualified for withholding of deportation and refugee status based on an "imputed" political opinion. We have held that persecution "on account of" political opinion includes persecution not only on account of political opinions that the petitioner actually holds, but also on account of opinions that the persecutor falsely attributes to the petitioner. See Rivas v. INS, 899 F.2d 864, 867 (9th Cir.1990); Hernandez–Ortiz v. INS, 777 F.2d 509, 516–17 (9th Cir.1985).

I cannot agree with the majority's analysis of religious persecution, however, because it treats as irrelevant the motive of the persecutor. Rather than stating that the persecutor's motive in persecuting is insignificant, the cases cited by the majority support the opposite proposition. See Lazo–Majano v. INS, 813 F.2d 1432, 1435 (9th Cir.1987) (petitioner persecuted "for her political opinion"); Hernandez–Ortiz, 777 F.2d at 516 ("persecution" is oppression inflicted on individuals "because of a difference that the persecutor will not tolerate"). The majority's conclusion also conflicts with the statutory "on account of" language, which clearly refers to the underlying motives or reasons behind the persecution. See 8 U.S.C. §§ 1101(a)(42)(A), 1253(h)(1).