Saideh **FISHER**, aka Saideh Hassib–Tehrani; **Kian Hosseini Lavasani,** Petitioners,

v.

**IMMIGRATION AND NATURALIZATION SERVICE,** Respondent.

No. 91–70676.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 13, 1993.

Decided Oct. 5, 1994.

---

Walter Rafael Pineda, Charles E. Nichol, San Francisco, CA, for petitioners.

Karen Fletcher Torsteinson, U.S. Dept. of Justice, Washington DC, for respondent.

Before: SCHROEDER, PREGERSON, and D.W. NELSON, Circuit Judges.

PER CURIAM:

Saideh Fisher and her son Kian Hosseini Lavasani are natives and citizens of Iran. An immigration judge ("IJ") denied their requests for asylum and withholding of deportation brought pursuant to Immigration and Nationality Act ("INA" or "Act") sections 208(a) and 243(h), 8 U.S.C.A. §§ 1158(a), 1253(h)(1) (West Supp.1993), and denied Fisher's application for voluntary departure under section 244(e), id. § 1254(e). The Board of Immigration Appeals ("Board" or "BIA") dismissed their subsequent appeal. Fisher and Kian now petition for review of the Board's judgment. We grant the petition, vacate the BIA's decision, and remand for further proceedings.

### Factual and Procedural Background

In February 1984, Fisher left Iran with her then eleven-year-old son Kian Lavasani. Because Kian's immigrant status derives

---

1. Because Fisher's credibility is not in dispute, we draw these facts from her testimony as well as other information contained in the record.

from his mother's, see 8 C.F.R. § 208.21 (1993), all further discussion will focus on the experiences and status of Fisher, see Shirazi–Parsa v. INS, 14 F.3d 1424, 1425 n. 1 (9th Cir.1994).

Fisher, who was divorced from Kian's father, left Iran because of three incidents that occurred in the several months prior to her departure.[1] Approximately six or seven months before she left Iran, Fisher attended a party at a male friend's house during which she observed her host in bathing attire. The neighbors promptly notified agents of the Khomeini government, who upon arriving at the house handcuffed Fisher and then detained her at the local "Comite." Fisher was questioned there for several hours and was told that being present with a man dressed in bathing attire was "incorrect." Admin.Rec. at 91. The authorities also took down Fisher's name and address. Because of this first encounter with government agents, Fisher suffered from amnesia and "nerves." Fisher saw a psychiatrist, who gave her medication. Fisher did not return to her job as a teacher for several months after this incident because she was incapacitated. When she did return, the school fired her.

A few months after the "swimming incident," Fisher was stopped on the street and ordered at gunpoint into a car by four government agents. She was stopped because she had left some strands of hair outside of her veil or "chador," which the Iranian regime requires all women to wear. Once she was in their car, the agents told her that this was not a proper way to appear on the streets. The agents warned Fisher to cover her hair and not to appear on the streets like that again or she would be subject to questioning and possible arrest. The agents then drove her home.

The third incident occurred just before Fisher's departure. Government agents searched her house. Before leaving, they told Fisher that they had been informed that there were people visiting the house who were against the Khomeini regime. They

See Gebremichael v. INS, 10 F.3d 28, 30–31 n. 1 (1st Cir.1993).

advised Fisher that, if she observed further "coming[s] and going[s]," she should inform the authorities. Admin.Rec. at 94. Fisher believed they were searching for people connected to her sister's husband, who was against the regime and was in prison at the time.

After leaving Iran, Fisher spent three months in Germany. During that time her step-cousin, Robert Lavasani, a United States citizen, asked Fisher to come to the United States to marry him. On April 30, 1984, Fisher legally entered the United States on a "fiance" visa. Fisher did not, however, wed Robert Lavasani. On August 4, 1984, she married Charles Fisher, a United States citizen. They divorced in 1987.

On February 4, 1986, the Immigration and Naturalization Service ("INS") began deportation proceedings against Fisher because she had overstayed her visa. At a hearing held on June 19, 1986, Fisher conceded her deportability. The proceedings were continued, however, to give Fisher the opportunity to file an asylum application.

Two additional hearings were conducted on May 15 and September 25, 1987, during which the IJ heard testimony from an INS official, Fisher, and Fisher's sister. Although he found "no lack of credibility in [Fisher's] testimony," the IJ denied Fisher's application for asylum and withholding of deportation. Admin.Rec. at 43–44. He also denied her application for voluntary departure; however, the IJ granted voluntary departure to Kian.

Fisher appealed to the BIA, and, with respect to her claims for asylum and withholding of deportation, raised two principal arguments. First, she maintained that her arrest for viewing her friend in a bathing suit and her detention for allowing her hair to become visible indicated that "she [had been] harassed for refusing to adhere to the regime's fundamentalist Moslem doctrines." Admin.Rec. at 18. Asserting that she possessed beliefs that were at odds with those espoused by the Khomeini regime, Fisher contended that these incidents demonstrated that the government "was attempting to eradicate [her beliefs] through violence"; consequently, Fisher reasoned that it was likely that she would suffer persecution upon return to Iran on account of those beliefs "whether considered as political or religious." *Id.* at 19. Second, Fisher appeared to claim that her brother-in-law's incarceration by the regime, coupled with the search of her residence, indicated that the regime viewed her as a political enemy. *See id.* at 20.

The Board rejected both arguments.[2] As to Fisher's violations of the Iranian fundamentalist laws, the Board noted that her detentions had been very brief and resulted from transgressing requirements that were applicable to "all women in Iran." Admin.Rec. at 5. Focusing on the treatment Fisher actually received, the BIA concluded that "[w]hile these rules may seem harsh by United States standards, we cannot say that they rise to the level of persecution." *Id.* The Board also rejected Fisher's second argument. Reasoning that "if the police thought that the respondent was connected with her brother-in-law's activities, they had ample opportunity to question her or detain her after they searched her house," the Board concluded that the search was unrelated to her brother-in-law's incarceration. *Id.* Fisher timely filed her petition for review of the Board's decision in this court. We have jurisdiction pursuant to 8 U.S.C. § 1105a(a).

### Applicable Provisions and Standard of Review

Under 8 U.S.C. § 1158(a), the Attorney General has discretion to grant an alien asylum if the alien is determined to be a "refugee." *See* 8 U.S.C. § 1158(a) (1988). A refugee is defined as any person who is unable or unwilling to return to his or her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C.A. § 1101(a)(42)(A) (West Supp. 1993). The "well-founded fear" standard has both objective and subjective components.

---

**2.** The Board also adopted the IJ's finding with regard to voluntary departure and rejected Fisher's argument that her son's eligibility for service in the Iranian military supported a well-founded fear of persecution on account of political opinion.

The subjective component may be satisfied by "an applicant's credible testimony that he genuinely fears persecution." *Acewicz v. INS,* 984 F.2d 1056, 1061 (9th Cir.1993) (citing *Berroteran–Melendez v. INS,* 955 F.2d 1251, 1256 (9th Cir.1992)). "The objective component requires a showing by 'credible, direct, and specific evidence of facts supporting a reasonable fear of persecution'" on the relevant ground. *Id.* (quoting *Rodriguez–Rivera v. INS,* 848 F.2d 998, 1002 (9th Cir. 1988) (per curiam)). The burden is on the applicant to meet this standard. *See* 8 C.F.R. § 208.5 (1993). Because demonstrating a right to withholding of deportation requires the satisfaction of the higher standard of proof of "clear probability of persecution," *see INS v. Cardoza–Fonseca,* 480 U.S. 421, 449–50, 107 S.Ct. 1207, 1222, 94 L.Ed.2d 434 (1987), failure to satisfy the lesser standard of proof for asylum necessarily results in a failure to demonstrate a right to withholding, *see Acewicz,* 984 F.2d at 1062.

■ When, as is this case, the Board has exercised its authority to conduct a *de novo* review of the IJ's decision, our review is limited to the BIA's decision. *See Shirazi–Parsa,* 14 F.3d at 1427. Factual determinations underlying the Board's order are reviewed under the "substantial evidence" standard. *See INS v. Elias–Zacarias,* 502 U.S. 478, ——, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992); *Shirazi–Parsa,* 14 F.3d at 1427; *Abedini v. INS,* 971 F.2d 188, 191 (9th Cir. 1992); 8 U.S.C.A. § 1105a(a)(4) (West Supp. 1993). Furthermore, "[w]e review do novo the Board's determination of purely legal questions regarding the requirements of the Immigration and Nationality Act." *E.g., Abedini,* 971 F.2d at 190–91; *Maldonado–Cruz v. Department of Immigration & Natu-*

*ralization,* 883 F.2d 788, 791 (9th Cir.1989); *accord Butros v. INS,* 990 F.2d 1142, 1144 (9th Cir.1993) (en banc). When appropriate, however, we apply the principles of deference to an agency's construction of a statute that it is charged with administering as articulated in *Chevron U.S.A., Inc. v. Natural Resources Defence Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and its progeny. *See, e.g., Hernandez–Vivas v. INS,* 23 F.3d 1557, 1560 (9th Cir.1994); *Montecino v. INS,* 915 F.2d 518, 520 (9th Cir.1990); *see also Mendoza v. INS,* 16 F.3d 335, 337 (9th Cir.1994); *Navarro–Aispura v. INS,* 842 F.Supp. 1225, 1227–28 (N.D.Cal.1993); *cf. Osorio v. INS,* 18 F.3d 1017, 1022–23 (2d Cir.1994).

## Analysis

■ This appeal presents three issues. First, Fisher contends that the BIA's decision must be reversed because the Board's conclusion that she does not possess a well-founded fear of political or religious persecution lacks substantial evidence. Second, Fisher now claims for the first time that she is eligible for asylum and withholding of deportation because she is a member of a "particular social group." Finally, Fisher asserts that the Immigration Judge abused his discretion in denying her voluntary departure. We find it necessary to address only the first issue.[3]

## I. Religious Persecution Based on the Enforcement of the Moral Codes

In rejecting Fisher's claim of persecution based upon the incidents involving the Iranian regime's enforcement of its ultraconservative rules, the Board appeared to reason that, because Fisher only had been "detained by

---

**3.** Because Fisher did not raise the "particular social group" argument in front of the BIA she failed to exhaust her administrative remedies with respect to that issue. Consequently, we lack jurisdiction to consider it in this appeal. *See Ravindran v. INS,* 976 F.2d 754, 761 (1st Cir.1992); *Perlera–Escobar v. Executive Office For Immigration,* 894 F.2d 1292, 1296 (11th Cir. 1990); 8 U.S.C. § 1105a(c) (1988); *see also Vargas v. United States Dep't of Immigration,* 831 F.2d 906, 907–08 (9th Cir.1987) ("Failure to raise an issue in an appeal to the BIA constitutes failure to exhaust remedies with respect to that

question and deprives this court of jurisdiction to hear the matter."); *cf. Saulsbury Orchards & Almond Processing, Inc. v. Yeutter,* 917 F.2d 1190, 1194 (9th Cir.1990) ("'When a statute requires exhaustion, a petitioner's failure to do so deprives this court of jurisdiction.'" (quoting *Reid v. Engen,* 765 F.2d 1457, 1462 (9th Cir. 1985))).

In addition, because we grant the petition for review with respect to the applications for asylum and withholding of deportation, we need not discuss the Board's decision regarding voluntary departure.

the police" after the swimming incident and "merely [taken] back to her house" after the chador incident, she had not experienced a sufficient quantum of suffering to amount to "persecution" within the meaning of the INA. Moreover, the Board appeared to hold, on the basis of this conclusion, that enforcement of the ultraconservative rules *never* could give rise to the level of harm sufficient to constitute persecution. As the BIA put it: "While these rules may seem harsh by United States standards, we cannot say that they rise to the level of persecution." Admin.Rec. at 5. It is apparent that, because the Board found the level of suffering that Fisher experienced insufficient to constitute persecution, it did not reach the question of whether enforcement of the moral codes, as claimed by Fisher, could result in persecution *on account of* religion or political opinion. *See id.*

We first conclude below that the Board erred in its analysis of whether Fisher might suffer harm amounting to persecution based upon enforcement of the Iranian ultraconservative laws. Because this conclusion alone would not warrant a remand unless any such harm could be said to arise "on account of" Fisher's beliefs or status, we then examine whether any persecution that Fisher might suffer could arise "on account of" a characteristic protected by the INA.

**A.** *The Board Erred in Failing to Consider whether Fisher Might Suffer Harm that Rises to the Level of Persecution for Future Noncompliance with the Moral Codes*

**1.**

 We find the Board's reasoning deficient in one fundamental respect. Although the Board purported to determine whether Fisher had a well-founded fear of future persecution, it considered only the treatment Fisher *actually* received for violating the regime's ultraconservative rules and

not the punishment that Fisher might receive for future transgressions. It long has been recognized, however, that past persecution and future persecution provide distinct avenues for obtaining eligibility for asylum. *See, e.g., Acewicz,* 984 F.2d at 1061–62; *Berroteran–Melendez v. INS,* 955 F.2d 1251, 1255 n. 3 (9th Cir.1992) (citing *Desir v. Ilchert,* 840 F.2d 723, 729 (9th Cir.1988)); *see also* 8 C.F.R. § 208.13 (1993) ("The applicant may qualify as a refugee either because he has suffered actual past persecution *or* because he has a well-founded fear of future persecution." (emphasis added)).[4]

Although Fisher maintained that the incidents she experienced in the past themselves amounted to persecution, the essence of her claim was that she would suffer persecution if forced to return to Iran. A proper evaluation of Fisher's claim of future persecution, consequently, should have included an assessment of the punishment that might be inflicted upon her for violating the ultraconservative laws should she return to Iran, and not merely her past experiences. *See Bastanipour v. INS,* 980 F.2d 1129, 1132–33 (7th Cir.1992) (holding that the BIA erred by considering only the Iranian regime's formal definition of, and prescribed punishments for, apostasy, as opposed to how the Iranian officials in reality might treat the petitioner if he were to return to Iran); *Rivas–Martinez v. INS,* 997 F.2d 1143, 1146–48 (5th Cir.1993) (holding that the BIA erred in failing to consider the possibility that a guerrilla group might learn of the petitioner's political beliefs despite their failure to learn of her beliefs up to that point). Accordingly, assuming *arguendo* that the Board determined correctly that Fisher was not eligible for asylum based upon past persecution, we hold that it erred by making its assessment of Fisher's past experiences conclusive as to the harm she might face upon return to Iran for further transgressions of the ultraconservative laws.

The Board's analytic error is particularly disturbing in light of significant evidence that

---

**4.** This particular regulation technically is inapplicable to Fisher's claim because it applies only to applications filed on or after October 1, 1990, *see* 55 Fed.Reg. 30,680 (July 27, 1990). It reflects, however, the codification of long-standing consistent administrative as well as judicial interpretation of the statutory phrase "persecution *or* well founded fear of persecution," 8 U.S.C.A. § 1101(a)(42)(A) (West Supp.1993) (emphasis added). *See, e.g., In re Chen,* 1989 WL 331860, 1989 BIA LEXIS 10, at *5, *7.

severe sanctions can result from noncompliance with the Iranian ultraconservative laws, which we term the "moral codes," *see generally* Nader Entessar, *Criminal Law and the Legal System in Revolutionary Iran,* 8 Boston College Third World L.J. 91, 98 (1988) (describing the imposition of punishment for "immoral behavior" or "immodest clothing" as codified aspects of the general category of offenses known as the *Ta'zir*—offenses for which no specific penalties are mentioned in the Quran but which are imposed in "the public interest").[5]

The State Department's *Country Reports on Human Rights Practices* that were available at the time of Fisher's asylum hearing indicate that, with respect to the enforcement of the moral codes, Fisher might well have been "one of the[ ] lucky ones." *Bastanipour,* 980 F.2d at 1133. The meting out of more severe punishment appears to have been a distinct possibility:

> Always the object of discriminatory practices in Iran's conservative society, women have faced even more discrimination since the Revolution. Ultraconservative dress, entirely hiding the hair and all of the body except the face and hands, is now a requirement for all women, regardless of their religion, national origin, citizenship, or diplomatic status. Women have been harassed, detained, or physically attacked if they appear in public in clothing which official or self-appointed guardians of public morality deemed insufficiently modest.

State Department, Country Reports on Human Rights Practices for 1987, at 1168 (1988) [hereinafter 1987 Country Reports].

Subsequent reports indicate that the regime has engaged in periodic crackdowns on violations of the moral codes, *see, e.g.,* State Department, Country Reports on Human Rights Practices for 1990, at 1454, 1457 (1991) [hereinafter 1990 Country Reports]; Department of State, Country Reports on Human Rights Practices for 1992, at 1001 (1993) [hereinafter 1992 Country Reports], and the nature and intensity of the regime's enforcement efforts appears to have varied according to which political faction has the upper hand, *compare Iran Lightens up on Western Ways,* Chicago Trib., May 3, 1993, at 3 (reporting that the regime had abandoned intensive enforcement efforts in favor of levying fines) *with Iran Cracks Down on Dress Code,* Chicago Trib., July 11, 1993, at 11 (reporting the initiation of new enforcement efforts that might result in incarceration). Indeed, one recent report stated that "[i]n Iran, order is ... kept by 3 million armed young people, called *Bassijis,* who roam the streets looking for women who are not wearing the traditional headgear and robes that Muslim women are required to wear." *Baha'is Calm in Centre of Storm,* Toronto Star, Jan. 22, 1994, at L15.

It is not only that the moral codes are enforced but also *how* they are enforced that demonstrates potential for persecution. Incarceration is not the only penalty that a woman who fails to comply with the practice

---

**5.** The verse from which Iranian intellectuals derive the aspects of the moral codes that prescribe women's appearance in public is:

> And say to the believing women [t]hat they should lower [t]heir gaze and guard [t]heir modesty; that they [s]hould not display their [b]eauty and ornaments except [w]hat (must ordinarily) appear [t]hereof; that they should [d]raw veils over [t]heir bosoms and not display [t]heir beauty except [t]o their husbands ....

Quran 24:31 (Abdullah Yusuf Ali Trans., 1987) [hereinafter Quran].

Leading Iranian intellectuals have interpreted the word *Zinat,* which appears above as "ornaments," also to include "parts of the body." *See, e.g.,* Freda Hussain & Kamelia Radwan, *The Islamic Revolution and Women: Quest for the Quaranic Model, in* Muslim Women 44, 47 (Freda Hussain ed., 1984) (discussing the views of Ayatollah Motahhari). From this interpretation, the proscription that women should reveal only the oval of the face and the two hands has been derived. *See id.* Many Muslims, however, interpret the verse as merely prohibiting a woman from revealing her figure or appearing undressed except in specific situations. *See, e.g.,* Quran, *supra,* 24:31 cmt. 2985 (discussing this interpretation of *Zinat* ); David L. Neal, *Women as a Social Group: Recognizing Sex–Based Persecution as Grounds for Asylum,* 20 Colum.Human Rights L.Rev. 203, 217 n. 69, 218 n. 71 (1988) (student author) (noting that Iran's interpretation must be distinguished from that found in other Muslim countries). Whatever the manner in which *Zinat* is interpreted, even the Iranian regime agrees that the Quran itself does not provide specific penalties for immodesty. *See, e.g.,* Entessar, *supra,* at 98.

of veiling, known as *hejab,* might face. As reported by one commentator:

> A women resisting *hejab* or related mandates must be punished. Finding justification in the Quran, Komeini and [the] various groups that support him have sporadically subjected women to grave punishment for even the most minor infractions whenever public morals have been involved. For example, ... women who refuse to wear the veil suffer severe penalties—the least of which is seventy-four lashes, administered immediately and without formal review.

David L. Neal, *Women as a Social Group: Recognizing Sex–Based Persecution as Grounds for Asylum,* 20 Colum.Human Rights L.Rev. 203, 219–20 (1988) (student author); *see also Slowly Fighting Back,* Toronto Star, June 2, 1992, at B5 (reporting that women might receive "[u]p to 70 lashes on the back, shoulders or legs, a hefty fine, a prison term, or a combination of all three" for violating the moral codes); *Valcourt to Review Woman's Expulsion,* Toronto Star, Oct. 22, 1991, at A20 (reporting on an asylum claim made in Canada by a woman who was "whipped on the back and buttocks with a wire cable by revolutionary guards" for "not wearing the veil required by Islamic law"). Furthermore, failure to comply with the moral codes can result in charges of prostitution, which might result in imprisonment accompanied by physical and sexual abuse. *See* Neal, *supra,* at 220–21; *cf. Hartooni v. INS,* 21 F.3d 336, 341 (9th Cir.1994) (reporting an incident in which a group of girls were " 'taken away' for a few days" by Iran soldiers because their hair was improperly bound). Executions for these "crimes against morality" also have been reported. *See* Neal, *supra,* at 222 & n. 96 (citing 1987 Country Reports, *supra,* at 1158).

The threats to life or liberty described in these reports clearly can rise to the level of "persecution." *See, e.g., Desir v. Ilchert,* 840 F.2d 723, 726–27 (9th Cir.1988). Consequently, we believe that the BIA, on remand, should closely consider evidence of *current* enforcement practices in Iran in evaluating Fisher's claim. *See Bastanipour,* 980 F.2d at 1132–33; *cf. Castillo–Villagra v. INS,* 972 F.2d 1017, 1030 (9th Cir.1992) (taking judicial notice of State Department reports for the limited purposes of determining whether an evidentiary hearing was warranted).[6] As the administrative record, which dates from the late 1980s, obviously contains *no* materials that bear on conditions in Iran in 1994, the Board should take further evidence on the question of what sanctions Fisher might face for future noncompliance with the moral codes. *See, e.g., Castaneda–Hernandez v. INS,* 826 F.2d 1526, 1531 (6th Cir.1987) (concluding that "the Board should supplement the record in order to evaluate how present conditions in El Salvador affect petitioner's claim"); *Bastanipour,* 980 F.2d at 1133.

2.

We also believe that the Board's analysis was flawed in a second respect. In concluding that Fisher's experiences with the enforcement of the moral codes did not rise to the level of "persecution" within the meaning of the INA, the Board implied that persecution must be evaluated solely on the basis of the physical sanction (for instance, prolonged imprisonment, lashes with a whip, or other direct forms of torture) imposed by the Iranian regime. We conclude, however, that persecution cannot be defined so narrowly.

(a)

It is important to understand the nature of Fisher's claim insofar as it is premised on

---

**6.** The sources discussed above are not part of the administrative record and our review is limited to that record. *See Gomez–Vigil v. INS,* 990 F.2d 1111, 1113 (9th Cir.1993); 8 U.S.C. § 1105a(a)(4) (1988); *accord Hartooni v. INS,* 21 F.3d 336, 340 (9th Cir.1994). Nonetheless, we have discretion to take judicial notice of appropriate materials that describe general country conditions when those sources bear on how an alien's particular experiences should be evaluated. *See, e.g., Shirazi–Parsa,* 14 F.3d at 1428

(citing *Lazo–Majano v. INS,* 813 F.2d 1432, 1435 (9th Cir.1987)). Although we are not "in a position to verify" the particular details in these sources, *Lazo–Majano,* 813 F.2d at 1435, we believe that it is indisputable that they demonstrate that *some* Iranians have experienced harm amounting to persecution for violating the moral codes. Accordingly, we take judicial notice of these materials for the limited purpose of establishing this proposition.

religious persecution. It is apparent from the hearing transcript that Fisher claims to be a Moslem who possesses religious beliefs contrary to those espoused by the Iranian regime, and that the Iranian regime's enforcement of the moral codes is one point of disagreement. Fisher testified that ·"[t]he way [the regime] look[s] at Islam is just superficial[ ]" and that she is "totally against it." Admin.Rec. at 102. Moreover, she explained that:

My opinions are different than the ones that the regime is holding right now. For example ... I am Moslem and so do they claim to be, but I don't believe they are. I don't believe in the way they treat people, the covering of the face, the way of life.

*Id.* at 89.

Fisher also maintained that the illness she suffered was related directly to the "terrifying horror" of living under the Khomeini regime, *see id.* at 94–95, 117, and contended in her brief to the BIA that the enforcement of the moral codes amounted to religious persecution because "she possess[es] beliefs which the government of Iran was attempting to eradicate through violence." *Id.* at 18–19. Fisher does not maintain that her *voluntary* compliance with the moral codes would amount to persecution. *Cf. Fatin v. INS,* 12 F.3d 1233, 1241–43 (3d Cir.1993) (considering a claim of persecution based upon membership in the particular social group of "Iranian women who find their country's gender-specific laws offensive and do not wish to comply with them"). Rather, she contends that the moral codes are persecutory because they represent a conception of Islam that she finds abhorrent *and* because the regime is attempting to suppress her beliefs through sanctioning her for non-compliance with the moral codes.

### (b)

██ Our precedents, as well as the Board's, strongly support requiring the BIA to consider these allegations in determining whether the harm suffered by Fisher could rise to the level of persecution even if the physical sanction imposed by the Iranian regime does not, by itself, rise to a threat to "life or liberty" as described above. The

Supreme Court has observed that "persecution" is "seemingly a broader concept than threats to 'life or freedom.'" *INS v. Stevic,* 467 U.S. 407, 428, 104 S.Ct. 2489, 2500, 81 L.Ed.2d 321 (1984). In this circuit, we have defined persecution to include " 'suffering or harm upon those who differ ... in a way regarded as offensive.' Persecution is ... 'oppression which is inflicted on groups or individuals because of a difference that the persecutor will not tolerate.'" *Desir,* 840 F.2d at 727 (quoting *Kovac v. INS,* 407 F.2d 102, 107 (9th Cir.1969) and *Hernandez–Ortiz v. INS,* 777 F.2d 509, 516 (9th Cir.1985)); *accord Arteaga v. INS,* 836 F.2d 1227, 1231 (9 Cir.1988) (quoting *Cardoza–Fonseca v. INS,* 767 F.2d 1448, 1452 (9th Cir.1985), *aff'd,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)); *Milosevic v. INS,* 18 F.3d 366, 370 (7th Cir.1994); *cf. Bastanipour,* 980 F.2d at 1133 (distinguishing persecution from "mere discrimination or harassment").

The BIA has accepted this broad definition. In *In re Acosta,* 19 I. & N.Dec. 211 (BIA 1985), *overruled on other grounds by In re Mogharrabi,* 19 I. & N.Dec. 439 (BIA 1987), the Board concluded that Congress intended the INA to incorporate the pre–1980 definition of the term "persecution," *see id.* at 222–23; *accord In re Sanchez & Escobar,* 19 I. & N.Dec. 276, 284–85 (BIA 1985). The Board also held that the "suffering or harm" inflicted could "consist of confinement or torture." *Acosta,* 19 I. & N.Dec. at 222. Elaborating on this definition, the Third Circuit explained recently in *Fatin v. INS,* 12 F.3d 1233 (3d Cir.1993), that:

*[T]he concept of persecution is broad enough to include governmental measures that compel an individual to engage in conduct that is not physically painful or harmful but is abhorrent to that individual's deepest beliefs.* An example of such conduct might be requiring a person to renounce his or her religious beliefs or to desecrate an object of religious importance. Such conduct might be regarded as a form of "torture" and thus as falling within the Board's description of persecution in [*In re Acosta*], 19 I. & N.Dec. [211,] 222–23 [ (1985) ]. Such a requirement could constitute "torture" or persecution,

however, only if directed against a person who actually possessed the religious beliefs or attached religious importance to the object in question. Requiring an adherent of an entirely different religion or a nonbeliever to engage in the same conduct would not constitute persecution.

*Fatin,* 12 F.3d at 1242 (emphasis added).

■ Based on this view, the Third Circuit assumed for the purposes of its analysis that "requiring some women to wear chadors may be so abhorrent to them that it would be tantamount to persecution." *Id.* at 1242; *accord Safaie v. INS,* 25 F.3d 636, 640 (8th Cir.1994) (agreeing with the *Fatin* court on this point). This case differs from *Fatin* in that it involves a claim of persecution based upon *forced* compliance of the moral codes, not a claim that *voluntary* compliance itself amounts to persecution.[7] However, we agree with the Third Circuit's general point: when a person with religious views different from those espoused by a religious regime is required to conform to, or is punished for failing to comply with, laws that fundamentally are abhorrent to that person's deeply-held religious convictions, the resulting anguish should be considered in determining whether the authorities have engaged in "extreme conduct" that is "tantamount to persecution." *Fatin,* 12 F.3d at 1240 n. 9, 1242.[8]

We believe this extension of the principles articulated in *Acosta* also is supported by this circuit's decision in *Canas–Segovia v. INS (Canas–Segovia I),* 902 F.2d 717 (9th Cir.1990), *vacated on other grounds,* —— U.S. ——, 112 S.Ct. 1152, 117 L.Ed.2d 401 (1992) (vacated and remanded in light of *Elias–Zacarias*), *aff'd (Canas–Segovia II),* 970 F.2d 599 (9th Cir.1992). *Canas–Segovia* involved asylum claims by two Jehovah's Witnesses who contended that their refusal to endure conscription into the El Salvadoran armed forces would result in political or religious persecution. In a portion of the opinion affirmed after remand from the Supreme Court, *see Canas–Segovia II,* 970 F.2d at 601–02, we concluded that "disproportionately severe punishment" amounting to persecution would result if petitioners' forced-service in the military would "cause them to sacrifice their religion's fundamental principle of pacifism," *Canas–Segovia I,* 902 F.2d at 728.

■ If the Jehovah's Witnesses in *Canas–Segovia* would suffer persecution when forced to sacrifice their belief in pacifism, we think it clear that being forced to conform to, or being sanctioned for failing to comply with, a conception of Islam that fundamentally is at odds with one's own also can rise to the level of persecution. *Cf. Lee v. Weisman,* —— U.S. ——, ——, 112 S.Ct. 2649, 2658, 120 L.Ed.2d 467 (1992) (recognizing that the religious dissenter of high school age who perceives "that she is being forced by the State to pray in a manner her conscience will not allow [suffers an] injury [that] is no less real" than "overt compulsion"). Indeed, when a member of a religion is forced to comply with an interpretation of her faith with which she disagrees, the case for persecution may be even stronger than it was in *Canas–Segovia:* the individual may suffer not only the general "torture" of conscience described by the Third Circuit in *Fatin,* but also the *additional* consequence of having imposed upon her a particular conception of the dictates of her own religion.

■ The INS nonetheless contends that, because "Congress did not define the term 'persecution' in either the asylum or withholding of deportation statutes," this Court must defer to the Board's interpretation of that term. Respondent's Brief at 19–20, *citing Chevron v. National Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

---

7. Voluntary (or "coerced") compliance is taken to mean compliance with the moral codes that avoids *any* sanction. Forced compliance, by contrast, involves conformity to the moral codes resulting from an encounter with the authorities. Only the latter is at issue in this case. *See supra* pp. 1379–80.

8. Of course, like the Third Circuit, we believe that "persecution" under this theory cannot be established merely on the basis that the petitioner states that she takes subjective offense at the existence of the law; some objective test must be met. *See Fatin,* 12 F.3d at 1242 n. 11. We also agree that " 'persecution' is an extreme concept that does not include every sort of treatment our society regards as offensive." *Id.* at 1243.

The Supreme Court does not routinely defer to the Board's interpretation of these asylum statutes. The Supreme Court did not mention *Chevron* in *INS v. Elias–Zacarias*, 502 U.S. 478, ——, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992). The Supreme Court expressly refused to apply *Chevron* in interpreting the refugee statutes in *INS v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), where the court emphasized that questions of statutory interpretation lie within the province of the judiciary, not the agency. *See Cardoza–Fonseca*, 480 U.S. 421, 446, 107 S.Ct. 1207, 1221. The issues before us are issues of statutory interpretation like those in *Elias–Zacarias* and *Cardoza–Fonseca*. By looking only to physical sanctions petitioner experienced in the past, the INS violated the clear terms of the statute that requires it assess the likelihood of future persecution.

As to whether "persecution" can include being forced to engage in conduct that is abhorrent to one's own religious beliefs, the Board in this case did not even consider the issue. Moreover, it is not at all clear that the Board's position in this regard is inconsistent with our own. Indeed, the Third Circuit in *Fatin*, 12 F.3d at 1242 (3rd Cir.1993), relying on the Board's own decision in *Acosta*, assumed without deciding that such coercion is persecution.

### 3.

■ The Board did not address the question of whether Fisher would, in fact, fail to comply with the moral codes should she return to Iran. Because Fisher's claim is premised on the enforcement of the moral codes, demonstrating that her future noncompliance is likely is necessary in order to establish that she has a well-founded fear of persecution for that reason.

Fisher does not have to show, however, that she will take conscious steps to violate the moral codes in order to meet her burden in this regard. Although the Third Circuit implied recently that Iranians have a simple choice with respect to the moral codes, either to comply or not to comply and face the consequences, *see Fatin*, 12 F.3d at 1241–42; *accord Safaie*, 25 F.3d at 640, we think that

this position ignores the realities of Iran. Clearly, one can violate the moral codes inadvertently. *Cf. Hartooni*, 21 F.3d at 341; *Iran Cracks Down on Dress Code*, Chicago Trib., July 11, 1993, at 11 (reporting an incident in which a female journalist had her car impounded because, she speculated, her "sunglasses were the problem"). Consequently, the Board should consider not only the possibility that Fisher intentionally would flout the moral codes, but also whether she might be sanctioned for inadvertent noncompliance.

### B. *Enforcement of the Moral Codes Can Result in Persecution on Account of Religion*

■ The government contends that we should affirm the Board's decision even if we find that the Board erred in its analysis of persecution. The INS relies upon the Supreme Court's decision in *Elias–Zacarias*, 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992), to argue that "[t]he petitioner['s] 'generalized' difference of opinion concerning the tenets of Islam does not constitute persecution on account of" a protected characteristic. Respondent's Brief at 19. However, *Elias–Zacarias* reversed a Ninth Circuit holding that would have obviated any necessity of Fisher proving motive on the part of Iranian authorities, *Canas–Segovia I*, 902 F.2d 717. Because *Elias–Zacarias* was decided after the Board's decision in this case, Fisher has never had an opportunity to attempt to satisfy its requirements.

Applying established principles relevant to motive to this case, it is clear that Fisher may be able to demonstrate persecution "on account of" religion.

■ The mere fact that generally applicable law impacts a particular religious group more harshly than it impacts the general population will not, of course, establish the requisite motive. *See Canas–Segovia II*, 970 F.2d at 601 (generally applicable military conscription law does not reflect motive to persecute Jehovah's Witnesses); *Cf. Abedini*, 971 F.2d 188 (9th Cir.1992) (generally applicable law does not evince motive to "persecute" those who disagree with the law's sub-

stance). However, if the evidence establishes that one of the reasons for the existence and enforcement of a generally applicable law is to oppress those with minority religious views, the existence of the necessary motive is clear. *See Bastanipour v. INS,* 980 F.2d 1129 (7th Cir.1992) (apostasy laws, which punish those citizens who convert from Islam, reflect the required motive, as there can be no doubt that the laws are intended to punish religious dissenters); *Acosta,* 19 I & N Dec. at 222 (noting that generally applicable laws have been found persecutory when "the punishment was imposed for invidious reasons"); *cf. Lukumi Babalu Aye, Inc. v. City of Hialeah,* —— U.S. ——, ——, —— – ——, 113 S.Ct. 2217, 2222, 2226–27, 124 L.Ed.2d 472 (1993), holding that a law that has the "impermissible object" of "suppress[ing] religious belief[s] or practice[s]" violates the free exercise clause.

In addition, Fisher may also be able to demonstrate the necessary motive and causation in a particular enforcement setting. *See, e.g., Hartooni,* 21 F.3d at 341; *Abedini,* 971 F.2d at 192. Thus, Fisher can demonstrate persecution "on account of" religion if she can show that the moral codes are likely to be enforced against her because of the authorities' intent to punish her for her actual or imputed beliefs. *See Abedini,* 971 F.2d at 192 n. 1. Of course, just as Fisher need not show that she purposely will fail to comply with the moral codes, *see supra* pp. 1381–82, it is not necessary for her to intend to make her views known to the Iranian regime. As the Fifth Circuit noted recently, to require "martyrdom" is to "ignore reality in general and reasonable human behavior in particular." *Rivas–Martinez,* 997 F.2d at 1147. However, evidence that Fisher's religious objections (or objections that might be imputed to her) to the moral codes have or might become known to the authorities; along with evidence that the moral codes are selectively enforced, or enforced more harshly against religious dissenters than true believers, might support an inference that the authorities' enforcement of the moral codes would be "merely a pretext to persecute [Fisher] for [her] beliefs." *Abedini,* 971 F.2d at 191. The inference would be reinforced by evidence that the authorities generally are intolerant of those who possess dissenting conceptions of Islam, or that the authorities are likely to enforce the moral codes against Fisher in spite of their knowledge of such beliefs.

Abundant evidence already exists that repeat violators of the moral codes are looked upon with suspicion by the regime, *see, e.g.,* Neal, *supra,* at 219–21; 1986 Country Reports, *supra,* at 1160, and that those who do not share the regime's Shiite conception of Islam have been targeted for persecution, *see, e.g., Bishop's Killing Puts Focus on Persecution in Iran,* N.Y. Times, Feb. 6, 1994, § 1, at 20 (reporting clashes between the authorities and Sunni Muslims in Meshed and Zahidan in Eastern Iran). We also note the extensive reports of the regime's general religious intolerance. *See, e.g., Hartooni,* 21 F.3d at 341 (discussing the persecution of Christians in Iran); *Missing Bishop Killed in Iran,* The Times, Jan. 31, 1994, at 1 (reporting that "in recent months, in step with the increased power of Ayatollah Ali Khamenei, the official spiritual leader, at the expense of President Rafsanjanji, the harassment of most religious minorities has intensified"); *Martyred for his Faith,* The Times, Feb. 15, 1994, at 1 (reporting on the persecution of Christians in Iran); *Baha'is Calm in Centre of Storm,* Toronto Star, Jan. 15, 1994, at L15 (discussing executions of adherents of the Baha'i faith by the Iranian regime).

We therefore remand for consideration of whether Fisher faces a well-founded fear of persecution "on account of" her religious beliefs.

## II. Political Persecution Based upon the Totality of the Circumstances

██ As discussed above, Fisher also contended in front of the Board that the Iranian regime's search of her house indicated that she was likely to face persecution on account of political opinion because her "brother-in-law was imprisoned by the regime, and the family house was searched in an attempt to find his associates." Admin.Rec. at 20. In her petition to this court, Fisher has clarified and reformulated this argument, and now claims that the search of her house by the

Revolutionary Guard "placed [her] in an extremely vulnerable position, *given that* she previously had been arrested, handcuffed, threatened at gunpoint and harassed by the military." Brief for Petitioner at 16 (emphasis added). In short, Fisher now argues that she reasonably fears "that she might be one of the suspected 'enemies' of the revolution," *id.*, and therefore, that she has established a well-founded fear of persecution on account of an imputed political opinion.

 Fisher's argument, essentially, is that a "combination" of factors indicate that the regime's interest in her is political. These include not only her brother-in-law's status and the search, but also her experiences involving the enforcement of the moral codes. We note that this "totality of the circumstances" approach is a viable means of demonstrating persecution on account of an imputed political opinion. *See, e.g., Shirazi–Parsa,* 14 F.3d at 1428–31. We also note that it is very different from the claim discussed above that is based upon the enforcement of the moral codes.

In the context of Fisher's "combination theory" of persecution on account of political opinion, the Iranian regime's record that she violated the moral codes functions merely as *evidence* that the authorities are likely to impute to Fisher "enemy of the regime" status. More generally, evidence that might support the conclusion that Fisher is viewed as an "enemy of the regime" may differ from that required to show that the Iranian authorities are likely to enforce the moral codes against her in a manner that evinces an intent to persecute her for her religious beliefs. In addition, the relevant punishment would not be solely that inflicted for violating the moral codes, but also would include the treatment that the regime accords to suspected political dissenters. Accordingly, although it is possible that a claim of persecution could satisfy both standards, this will not necessarily be the case.[9]

The Board, however, has not yet passed on the merits of Fisher's "enemy of the regime" argument. Below, it apparently interpreted Fisher to contend that the search of her house evinced a political motive *solely* because she linked it to her brother-in-law's incarceration, although this is not perfectly clear. Accordingly, we do not pass on the merits of Fisher's reformulated argument, but leave it for the Board to address upon remand.

### Conclusion

For the above reasons, the petition is granted. The decision of the Board is vacated, and the cause remanded for further consideration.

**Vacated and Remanded.**[10]

---

9. For instance, it would not be inconsistent for the Board to reject Fisher's contention that the Iranian government is likely to impute to her "enemy of the regime" status, and yet conclude that the Iranian authorities enforce the moral codes with the purpose of oppressing religious dissenters, and that Fisher suffers oppression because of her deeply felt religious beliefs.

10. The panel retains jurisdiction over any subsequent appeal.