48 F.3d 1227
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 Florante DE LEON; Ruth De Leon, Petitioners,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 93-70584.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 2, 1994.
Decided Feb. 23, 1995.
 
 Petition to Review a Decision of the Immigration and Naturalization Service, I & NS Nos. Aci-gid-xww, Agl-mry-hty.
 INS
 REVERSED.
 Before: BROWNING, TROTT and KLEINFELD, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 We grant this petition for review of a denial of asylum, because petitioner established a well-founded fear of persecution for political opinion.
 
 I. FACTS
 
 3
 Florante De Leon and his family[1] seek asylum under 8 U.S.C. Sec. 1158 or, in the alternative, withholding of deportation under 8 U.S.C. Sec. 1253(h). We reverse the asylum determination, and therefore do not reach the withholding of deportation determination. We conclude that the Board of Immigration Appeals' denial of asylum was not supported by substantial evidence on the record taken as a whole. 8 U.S.C. Sec. 1105a(a)(4).
 
 
 4
 Mr. De Leon, whose stage name was "Florante," was a well known folk singer in the Philippines. The newspaper clippings he submitted to the INS described him as a "star." During the Marcos years, Mr. De Leon released seven popular, long-playing albums. He had a few gold records, and ran his own recording company.
 
 
 5
 According to Mr. De Leon's declaration, he was the first folk singer in the Philippines to sing songs critical of the Marcos regime. One of his clippings from a newspaper entertainment section refers to "Florante" as "well loved then by millions of Filipinos for deep concern for Philippine nationalism," and "well known with his long hair tied behind his neck and a moustache to go with." The clipping says he sang "unforgettable" songs "which hit Marcos for refusing to vacate his throne."
 
 
 6
 During the 1986 election campaign, though, Mr. De Leon sang for Marcos, not Aquino. The Marcos campaign paid him. His campaign singing identified him publicly as a Marcos supporter.
 
 
 7
 After Aquino took power, Mr. De Leon continued to sing anti-government folk songs, as he had under Marcos. The administrative record includes English translations of some of Mr. De Leon's lyrics. They are indeed critical of the Aquino government. Based on the lyrics, it is highly plausible that the government and its supporters would be unhappy with Mr. De Leon's expression of his political opinions.
 
 
 8
 The Aquino government, according to Mr. De Leon's evidence, took steps to silence him in retaliation for his critical folk songs. He was charged, he claims falsely, with illegal assembly, inciting rebellion, sedition, and treason, because of a pro-Marcos political rally on May 1, 1986, which turned violent. Also, he and his wife received telephone calls threatening physical harm to him and his family if he continued to sing songs in public criticizing the Aquino government.
 
 
 9
 Mr. De Leon also testified that the Aquino government took steps against him economically. His records, he testified, were banned from being played on radio and television, and from being sold in stores. The ban was carried out by means of a memorandum from the Philippine Commission on Good Government, an organization which had the power to confiscate newspaper and radio and television assets. The memorandum allegedly told radio stations not to air Mr. De Leon's songs.
 
 
 10
 After the Philippine Commission on Good Government sequestered assets of the leading Philippine brewery, Mr. De Leon was "scratched off the deal" to sing in the beer commercials as he had done before. Some of Mr. De Leon's concerts were cancelled because the producers were afraid the government would have him in jail when he was scheduled to perform. Aquino supporters told a producer of a concert in an especially lucrative location that the place would be closed permanently if Mr. De Leon performed there.
 
 
 11
 In May of 1986, despite the pending criminal charges, Mr. De Leon was allowed to fly to the United States. He returned in June. Friends warned him that he should leave. Friends in the military called Mr. De Leon on the telephone and told him that he should leave, because otherwise he would be arrested. He left in August. He had no trouble getting out, even though he was famous and most probably was recognized.
 
 
 12
 Mr. De Leon's wife and children remained in the Philippines. He had a return ticket. Then Mrs. De Leon received a phone call from the principal of her son's school. He told her that a stranger had tried to pick up her son. Because she had not authorized anyone other than her household help to pick up the boy, she believed this to be a kidnap attempt. There were also a number of threatening phone calls, which were followed by the appearance of two armed men at the De Leon house. They asked at the door for Mr. De Leon, and then parked outside the house most of every day for about a week. Mrs. De Leon believed that, despite her husband's absence, she and her family were still at risk, so she took her children and fled the country to join her husband.
 
 
 13
 Since getting out of the Philippines, the De Leons have been put in fear of going back. Mr. De Leon testified that he has received telephone calls saying that if he did not stop doing business with the "Marcos poison," he would be killed. A friend wrote that he should "find a way to stay in America" because "it is very dangerous for everyone who has been charged with opposing the present government." The letter mentioned an actress. She had been discussed in the same newspaper articles as Mr. De Leon, as a pro-Marcos entertainer. The letter said she "was taken from her house and was kidnapped--she has been found already but with horrible marks all over." Mr. De Leon's request for asylum said that his lawyer had been assassinated. He attached a newspaper clipping about the murder by a leftist group of another prominent pro-Marcos person.
 
 
 14
 Neither Mr. nor Mrs. De Leon were happy about trading the lives they had led in the Philippines for their new lives in the United States. Mr. De Leon said that he found it very hard working eight hours a night as a hospital security guard for $3.50 an hour, instead of being a celebrity in the Philippines, recognized by nine out of ten people in the street. But, he testified "I'd rather have this kind of life, than going back there and be killed. And make my kids orphans." Mrs. De Leon preferred her life with maids and a driver in the Philippines, to having to work in the United States. But, she testified, "I'm scared to go home."
 
 
 15
 The evidence summarized above sets out a straightforward asylum case of a man forced to flee his country because of a well-founded fear of persecution on account of his political opinions. We make no independent judgment on whether the government of the Philippines or its supporters act as Mr. De Leon's evidence suggests. Nor can we consider evidence which supporters of the Philippine government might have submitted, had they or that government been parties to the case. Our review is limited to whether there was substantial evidence on the record as a whole to support the BIA's conclusion to the contrary. There was some evidence to support the BIA's view, and we must determine whether the evidence on that side of the case was substantial when taken with the record as a whole.
 
 
 16
 The most substantial evidence against Mr. De Leon was a 1988 letter from the State Department Office of Asylum Affairs. The State Department gave the opinion, based on country conditions rather than information about Mr. De Leon, that Mr. De Leon did not have a well-founded fear of persecution, and said:
 
 
 17
 Specifically, we have not been able to confirm the existence of any formal charges against the applicant. The Aquino government has only filed charges against opponents who it believes have violated laws, particularly those involved in anti-government violence and those who own sequestered assets.
 
 
 18
 This opinion is based on our analysis of country conditions and other relevant factors, plus an evaluation of the specific information provided in the application. We do not have independent information about this applicant.
 
 
 19
 The BIA decision took note of the State Department opinion, and distinguished prosecution for a criminal offense from persecution for political opinion.
 
 
 20
 The BIA decision, denying asylum because of lack of a well-founded fear of persecution, notes that Mr. De Leon left the country without hindrance in May of 1986, returned in June, and again left in August. The decision points out that "the respondent was never bothered by anyone in the Philippines and was permitted to leave and return to the Philippines whenever he chose to do so." The BIA decision also says that Mr. De Leon "presented no documentary evidence concerning the political situation in the Philippines or any evidence that would support his contention that he has a well-founded fear of persecution if he returns to the Philippines." Because of what it calls the "unexplained absence of such evidence," the BIA infers that Mr. De Leon's claim "may be exaggerated or unfounded." The BIA also writes that "there is no evidence in the record that anyone in the Philippines is interested in harming the respondent or his family."
 
 
 21
 The BIA does not find that Mr. De Leon was not telling the truth. It infers the possibility that his claim "may be exaggerated or unfounded" from what it terms the absence of documentary evidence, but it does not find that his claim is exaggerated or unfounded. The only express finding of credibility in the record is the one by the Immigration Judge. He found that Mr. and Mrs. De Leon were "honest."
 
 II. ANALYSIS
 
 22
 The first issue regarding Mr. De Leon's evidence is whether it is true. We make no independent determination of its truth. It is important that the BIA made no adverse finding regarding Mr. and Mrs. De Leon's credibility. The rule is that "[a]bsent an explicit finding that a specific statement by the petitioner is not credible we are required to accept [the] testimony as true." Hartooni v. INS, 21 F.3d 336, 342 (9th Cir.1994). The BIA's "may be exaggerated or unfounded" statement is not, in the context of this case, an "explicit finding that a specific statement by the petitioner is not credible." "May be" does not equal "is."
 
 
 23
 This is not a matter of whether the BIA used the right words to reject Mr. De Leon's account. If we were to interpret its "may be exaggerated or unfounded" characterization as a finding that Mr. De Leon was not telling the truth, then the finding would be unsupported by substantial evidence on the record as a whole. The inference of exaggeration is based entirely upon there being "no documentary evidence concerning the political situation in the Philippines," no evidence supporting Mr. De Leon's claim of a well-founded fear of persecution if he returns, and no evidence that anyone in the Philippines is interested in harming him or his family. These factual propositions about the record fit within legal theories of cases the BIA cites. But they are not an accurate description of the record in this case.
 
 
 24
 The record contains substantial evidence for each of the propositions for which the BIA says there is "no" evidence. Mr. De Leon submitted clippings from Philippine and American newspapers corroborating Mr. De Leon's claim that he was arrested as part of a crackdown on anti-Aquino entertainers at a rally which turned violent, that he was a famous entertainer himself, that the government was using the Commission on Good Government to censor the press by means of its unlimited power to confiscate private business enterprises, and that another prominent Marcos supporter had been slain by "suspected NPA[2] hitmen." Mr. and Mrs. De Leon's testimony, if believed, was evidence for the proposition that a kidnapping attempt had been made on his child and that armed men had sought him out individually.
 
 
 25
 To corroborate his statement that he had received a letter warning him to stay away, Mr. De Leon submitted the letter. To provide foundation for his claim of a well-founded fear of persecution, Mr. De Leon submitted evidence showing that people in positions similar to his own were being persecuted in the Philippines.
 
 
 26
 The State Department letter, saying that the pendency of criminal charges against Mr. De Leon could not be confirmed, did not establish that Mr. De Leon had not been charged as he claimed. The newspaper clippings he submitted headlined the charges against him. Both Mr. De Leon's testimony and the State Department letter would be correct if the charges were filed in 1986, and dismissed by 1988. The State Department letter on the general practices of the Aquino government cuts against the credibility of Mr. and Mrs. De Leon's testimony about their personal experience, but Mr. and Mrs. De Leon's experience could be an unfortunate exception to the generally prevailing political conditions. By itself, in light of the BIA's stated reasons for rejecting Mr. De Leon's asylum claim, the State Department letter does not amount to substantial evidence on the record taken as a whole supporting the BIA's decision. Also, Mr. De Leon's fear may be well-founded on the basis of threats from the "New People's Army" or other factions acting outside the formal governmental structure, even if the formal government does not persecute opponents. Castillo-Villagra v. INS, 972 F.2d 1017, 1030 (9th Cir.1992); Rodriquez-Rivera v. INS, 848 F.2d 998, 1005-06 (9th Cir.1988).
 
 
 27
 The BIA's reason for suggesting that Mr. De Leon's claim "may be exaggerated or unfounded," was an "absence of documentary evidence concerning the political situation in the Philippines." Because there is not substantial evidence on the record as a whole for this proposition, we treat the testimony as true for purposes of determining whether substantial evidence supported Mr. De Leon's claim of a well-founded fear of persecution justifying a grant of asylum. The BIA mentions in its opinion that Mr. De Leon was allowed to leave the Philippines and return as he chose in 1986, but does not state what inference it draws from this fact. His May departure, June return, and August departure could mean that the government did not persecute him, that it sought to persecute him but was inefficient, or that it did persecute him and preferred hounding him out of the country to completing its criminal prosecution. He might be less of a potential factor in Philippines politics as a night hospital security guard in the United States than as a folk singer in the Philippines or an imprisoned convict in the Philippines.
 
 
 28
 The BIA is correct that the criminal charges against Mr. De Leon do not support reversal under the deferential standard of review applicable. Prosecution under a law of general applicability does not amount to persecution. Mabugat v. INS, 937 F.2d 426, 429 (9th Cir.1991); Abedini v. INS, 971 F.2d 188, 191 (9th Cir.1992). Mr. De Leon claims that the charge was false. But the State Department letter, and Mr. De Leon's presence at the riot, are substantial evidence on the record taken as a whole from which the BIA could conclude the contrary. The criminal charge against Mr. De Leon does not suffice to establish a well-founded fear of persecution.
 
 
 29
 Mr. De Leon's decline in concert bookings does not amount to persecution. See Shoaee v. INS, 704 F.2d 1079, 1084 (9th Cir.1983). That he makes less money because his party has been replaced by another does not amount to persecution.
 
 
 30
 But his testimony established more than this. He inferred a threat from the attempted pickup by an unauthorized stranger of his son, the armed men who came to his door and stayed outside his house for a week, the telephoned death threats to him, and the killings of other prominent Marcos supporters. That is a reasonable inference. A threat to kill Mr. De Leon because of his expressed political opinions, if it produced a well-founded fear that the threat would be carried out, would suffice to entitle him to asylum. Barraza Rivera v. INS, 913 F.2d 1443, 1450-53 (9th Cir.1990).
 
 
 31
 Also, Mr. De Leon's economic decline was not just a matter of losing the paid work for the Marcos campaign, or from the nationalized brewery not wanting to hire a Marcos supporter. He testified that people who wanted to play his songs on the radio or have him appear at a concert could not, because the Philippine Commission on Good Government, which could take their assets, told them they should not. "[A] probability of deliberate imposition of substantial economic disadvantage upon an alien for reasons of race, religion, or political opinion is sufficient" to demonstrate a well-founded fear of persecution. Kovac v. INS, 407 F.2d 102, 107 (9th Cir.1969). The BIA decision does not speak at all to why these facts did not give rise to a well-founded fear of persecution.
 
 
 32
 It is hard to see why Mr. and Mrs. De Leon would leave their lives as wealthy celebrities, even if the change of regimes would reduce their wealth, for the lives they now lead in America, were it not for the fear they claim. It's been a long way down, from folk singing star to night security guard at a hospital. His Philippine fame is of little economic value here, as it might be in the Philippines if he continued singing, or even just opened a bar or restaurant.
 
 
 33
 The standard of review, substantial evidence on the record as a whole, is deferential, but not so deferential as to allow affirmance where such evidence is lacking, and the BIA's characterization of the record is mistaken. We have read the record, and, taking it as a whole, cannot find substantial evidence to sustain the BIA's determination that Mr. De Leon lacks a well-founded fear of persecution by reason of his political opinions. Because substantial evidence does not support the BIA's determination, we do not need to address whether the petitioners would meet the more stringent standard of a clear probability of persecution required for withholding of deportation. See Berroteran-Melendez v. INS, 955 F.2d 1251, 1258 (9th Cir.1992). On this record, the BIA should have exercised its discretion to grant refugee status under 8 U.S.C. Sec. 1158(a), so we remand for that purpose.
 
 
 34
 The petition for review is GRANTED. The BIA decision is REVERSED and the case is REMANDED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 The government and petitioners agree that the outcome on Mrs. De Leon's petition depends on the result in Mr. De Leon's petition, so they do not brief and we do not discuss her petition separately. See Fisher v. INS, 37 F.3d 1371, 1374 (9th Cir.1994). The parties evidently assume that asylum for Mrs. De Leon and the children would follow under 8 U.S.C. Sec. 1158(c) and 8 C.F.R. Sec. 208.21 if Mr. De Leon prevails
 
 
 [2]
 New People's Army